THE MANHATTAN MANUFACTURING AND FERTILIZING COMPANY *vs.* THE NEW JERSEY STOCK YARD AND MARKET COMPANY and others.

1. The New Jersey Stock Yard and Market Company leased to the Manhattan Manufacturing and Fertilizing Company certain premises for the specified business of manufacturing and preparing fertilizers and manures, and the materials for that purpose. The lessors gave the lessees "the refusal and exclusive right of saving and taking all the blood of animals slaughtered in their abattoir and sheep-house, and of saving and taking the animal matter and ammonia from their rendering tanks, and of using the same in their business." The fertilizing company thereby bound themselves "to save all that is possible of the blood from the animals slaughtered, and the animal matter and ammonia from the tanks, to prevent any effluvia or stenches from escaping, and to prevent any and all nuisances from being created in any manner whatsoever, either in saving the blood, animal matter, or ammonia, or in converting the same into articles of commerce." The stock yard company subsequently leased their abattoir to Payson and Sherman. Sherman entered into partnership with two other of the defendants (at the time of the lease in the employ of the stock yard company,) under the name of the Bergen Manufacturing Company, for the manufacture of albumen and fertilizers. The complainant demanded all the blood of the animals slaughtered at the abattoir, but by an arrangement with certain butchers who slaughtered there, the Bergen Manufacturing Company have been and are taking a large part of the blood. *Held*, on application for injunction, that with every permission to use the abattoir after the lease, the stock yard company had the right to demand that every user of the abattoir should leave these matters for the complainant; and this, by its covenant, it was bound to do. And the de-

fendants, having notice of this obligation, must be restrained from taking the blood and other matters which the complainant is entitled to take under its lease.

2. Such injunction is not mandatory. It does not require the delivery of the blood, but restrains the defendants from permitting any others than the complainant to take it.

3. The remedy at law is inadequate. The value of the blood is no measure of the injury, and it is hardly possible to compute the damages which the injury may occasion.

4. A deed of a corporation, under its corporate seal, and signed by the proper officer, is presumed to have been executed by authority of the corporation. An allegation in the bill to the contrary, supported only by an affidavit of belief that the facts are true, is not sufficient to overcome the presumption.

The argument was upon a rule to show cause why an injunction should not issue to restrain the defendants from suffering or permitting any other person than the complainant to take or save any of the blood of the animals slaughtered at the abattoir of the stock yard company, at Communipaw, in the county of Hudson.

*Mr. McCarter,* for complainant.

*Mr. I. W. Scudder* and *Mr. Winfield,* for defendants.

THE CHANCELLOR.

The complainant is a corporation of the state of New York, doing business at Communipaw. The defendant, the stock yard company, a corporation of this state, owns a large and extensive abattoir, or slaughter-house, at Communipaw. It has not, for some years, slaughtered animals there, but let to butchers the privilege of slaughtering their animals in the abattoir. Previous to August, 1870, the blood and other remains of animals thus slaughtered there by the butchers, not being removed or properly cared for, had created a stench which became a nuisance to the adjoining country, and the company was restrained by an injunction from permitting the business to be carried on there, unless on condition of having the blood and offal perfectly cared for. The butchers paid

for the privilege of slaughtering there, and left the blood and offal on the premises, to be cared for by the stock yard company. These difficulties became a serious embarrassment in the enterprise. The complainant undertook to manage this, and to remove and manufacture the blood and other abandoned refuse left on the premises by the butchers, so as to prevent any public or private nuisance that might else arise from them.

To effect the objects of this arrangement, the stock yard company, on the 5th of August, 1870, made a lease to the complainant of certain premises adjoining the abattoir, for the specified business of manufacturing and preparing fertilizers and manures, and the materials for that purpose. The term was for twenty years from April 20th, 1867, with privilege of renewal, and the rent to be paid was fifteen per cent. of the net profits of the business. The lease contained this provision: "The parties of the second part shall also have the refusal and exclusive right of saving and taking all the blood of animals slaughtered in the abattoir and sheep-house of the parties of the first part, and of saving and taking the animal matter and ammonia from the rendering tanks of the parties of the first part, and of using the same in their business." And also this agreement on part of the complainant: "Said parties of the second part hereby bind themselves to save all that is possible of the blood from the animals slaughtered, and the animal matter and ammonia from the tanks, to prevent any effluvia or stenches from escaping, and to prevent any and all nuisance from being created in any manner whatsoever, either in saving the blood, animal matter, or ammonia, or in converting the same into articles of commerce."

The lease was executed by the president of the stock yard company, in the name of the company, by affixing its common seal and his signature. The execution was duly proved, and the lease recorded in Hudson county clerk's office, August 20th, 1870.

The complainant, on faith of the lease, erected on the demised premises expensive buildings and machinery for the

purpose of the manufacture.    These were completed by January 9th, 1871.    In the meantime arrangements had been made by the complainant with the stock company and its employees for coagulating the blood on the premises, and for preventing nuisances arising from slaughtering in the abattoir. Part of this coagulated blood had, with complainant's acquiescence, been delivered to John J. Craven, one of the defendants, for making experiments or manufacturing it.

In April, 1871, the stock yard company leased its abattoir to Henry R. Payson and David H. Sherman, two of the defendants, who have since carried on the business under the name of D. H. Sherman & Co.    The defendant, Isaac Freese, who was in the employ of the stock yard company as superintendent, and continued in the employ of D. H. Sherman & Co. in the like capacity, entered into partnership with the defendent, Craven, who was also in the employ of the stock yard company at the making of its lease to the complainant, and with the defendant, Sherman, under the name of " The Bergen Manufacturing Company," for the purpose of manufacturing albumen and fertilizers.

After January 9th, 1871, the complainant demanded all the blood of the animals slaughtered at the abattoir, but Craven made an arrangement with certain butchers who slaughtered there, for saving and taking the blood of the animals slaughtered by them, and this was permitted by Sherman & Co., and Freese, their superintendent; and a large part of the blood is thus taken and delivered to Sherman, Freese, and Craven, and is lost to the complainant.

By the record of the lease to the complainant, Sherman, Craven, and Freese had constructive notice of its contents, and also it is clear that they, as well as Payson, had actual notice.    They do not deny this, but take the ground that the blood, like all other parts of the animal slaughtered, belongs to the butcher, and that they or the stock yard company, can no more control or deliver it than they could control the flesh or hides.    That the butchers having discovered that the blood has

a merchantable value, have a right to dispose of it for their own benefit; and that when they had determined to sell it, and not to abandon it, Craven was under no obligation not to buy it, and his firm might receive it through him without breach of faith.

This defence, at first sight, is seemingly good; but it wholly rests upon the correctness of the premises, to wit, that the stock yard company had not the right or power to control the disposition of the blood. It is not claimed that it had, before the complainant's lease, granted to any one the privilege of slaughtering there. If it had, for a term unexpired, it would have lost the control. Before that, they had permitted butchers to slaughter there without any provision about disposing of the blood or offal. It may, by custom, have been the effect of such contract, that the butcher might leave the blood and offal to be removed by the company. If left, the company was liable for any nuisance occasioned by it. It cannot be doubted that the company could have required, as a condition, that the butchers should remove the blood and offal. It had the right to prevent any one from using the abattoir who would not comply. Before the lease to the complainant, this condition would have been deemed a burden on the butchers, and might have injured the business of the company. It was in difficulty by reason of the nuisance caused by leaving these matters, and the injunction growing out of it. It was relieved by this lease. The consideration was the exclusive right to take the blood and offal which was secured by covenant to the complainant. After that, the company had the same right to demand of every one using the abattoir that he should leave these matters for the complainant, as it had to require him to remove them. This could have been annexed as a condition to every permission to use the abattoir, as well as the condition to pay for the use. And this, by its covenant, the company was bound to do. D. H. Sherman & Co., as the lessees, are bound by the same covenant. And Freese, Craven, and Sherman having notice of this obligation before they commenced their business, are

bound to refrain from interfering with these rights of the complainant, and from taking the blood and other matters which it is entitled to take. *Tulk* v. *Moxhay*, 2 *Phil.* 774; *De Mattos* v. *Gibson*, 4 *DeG. & Jones* 276.

The facts that Freese and Craven transferred to the complainant their claim to a patent for making albumen from blood, and took part in the arrangements for the lease by the company in whose employ they were, and that Craven interfered by these negotiations with the butchers after he was repulsed in his attempt to get into the employ of the complainant, do not give greater validity to the complainant's right; they may show bad faith and vindictiveness, and that they are not entitled to any favorable consideration beyond their legal rights.

The injunction applied for is not a mandatory injunction; it is not to require the delivery of the blood, but to restrain Craven from taking it, and the other defendants from suffering or permitting any other person than the complainant to take it.

For this injury there is a remedy at law, but it is not an adequate remedy. The value of the blood is no measure of the injury, and it is hardly possible to compute the damages which the injury may occasion. And redress at law could only be obtained by a continued series of suits through the twenty or forty years of the complainant's term. It is a case peculiarly proper for the preventive remedy by injunction. *Shreve* v. *Black*, 3 *Green's Ch.* 177.

The defendants, in their answers, deny that the seal of the stock yard company was affixed to the lease by authority of the directors. The bill alleges that the stock yard company made and executed the lease under its corporate seal, and sets out a lease with the seal affixed, and signed by the president. The answer of the company is not verified by any one who has knowledge of the facts. The present secretary swears that he believes the facts to be true. Any deed of a corporation, under its corporate seal and signed by the proper

officer, is presumed to have been executed by authority of the corporation, until the contrary is clearly shown. *Leggett* v. *N. J. Man. & Bank'g Co.*, Saxt. 541. There is no proof here to overcome this presumption.

The injunction must issue as prayed for.