CHRISTIAN FEIGENSPAN, a corporation,

*v.*

JOSEPH NIZOLEK.

[Argued May 31st, 1906.    Decided July 10th, 1906.]

1. Evidence *held* to show that, when defendant signed it, he fully understood the nature and effect of an agreement to sell complainant's beer exclusively for five years.

2. Though an agreement that defendant should sell complainant's beer exclusively for five years did not specifically bind complainant to furnish it at any time, where complainant tendered itself ready to furnish it to him on the usual terms, defendant could not purchase of other brewers so long as the complainant continued to furnish beer to him at reasonable rates and of good quality.

3. As a general rule, where a chancery court has concurrent jurisdiction with the law courts of a cause brought in equity, the defendant should

take his objections to the jurisdiction on the ground that complainant has an adequate remedy in law early in the action, either by demurrer or by answer, or it will be waived.

4. Where complainant loaned a specified sum of money, large in comparison with the value of the land mortgaged as security, and incurred trouble and risk in the transaction to obtain from defendant an agreement to sell complainant's beer exclusively for five years, there was sufficient consideration to support the agreement.

5. Where, on August 16th, complainant loaned defendant $4,800 for one year on a real estate mortgage, in consideration of defendant's agreement to sell complainant's beer exclusively for five years, a voluntary discharge of the debt on December 26th did not deprive complainant of the right to enforce the agreement.

6. In considering what is an adequate remedy at law, the courts will take into consideration, not only the question of the multiplicity of suits, but also the pecuniary responsibility of the defendant.

7. Complainant had no adequate remedy at law, where defendant broke an agreement to sell complainant's beer exclusively for five years, because of the difficulty of ascertaining and proving in an action of law the amount of beer defendant had sold in violation of the agreement, the difficulty of showing the profits complainant would have made, the necessity of a multiplicity of suits, and the uncertainty of the pecuniary responsibility of defendant.

On final hearing on bill, answer and proofs.

The object of the bill is to enforce a written contract by enjoining the breach of a negative covenant therein. The contract is as follows:

"Know all men by these presents, that I, Joseph Nizolek, of the city of Elizabeth, county of Union and State of New Jersey, in consideration of the sum of one dollar and other valuable considerations, do hereby agree to purchase from Christian Feigenspan, a corporation, all ales, lager beer and porter as sold in my saloon at number seventy-three Florida St., in the city of Elizabeth, New Jersey, for the period of five years.

"And I further agree that I will not sell or offer for sale any ale, lager beer or porter in my saloon at number seventy-three Florida St., in the city of Elizabeth, New Jersey, except that manufactured by the said Christian Feigenspan, for the same period as above mentioned; and it is further understood that this agreement is to bind the successor or successors of the said party of the first part in the purchase of the property or said saloon business: and the said party of the first part agrees not to dispose of said saloon business unless his purchaser shall sign the above stipulation relative to the sale of the beers, ales and porter of the said party of the second part exclusively.

"In witness whereof, I have hereto set my hand and seal this sixteenth of August, nineteen hundred and five.

                                "JOSEPH NIZOLEK.   [L. S.]
    "Signed, sealed and delivered in the presence of
                                "ABRAM H. CORNISH."

The allegation of the bill is that the contract was part of an arrangement by which the complainant loaned to the defendant the sum of $4,800 to enable him, the defendant, to purchase the premises mentioned in the contract and took as security therefor the bond and mortgage of the defendant at one year with interest. It farther alleges that the complainant is a brewer and was ready and willing at all times to deliver beer to the defendant, and the defendant commenced and continued to purchase beer from it for a period of about three weeks, and then declined to purchase any more from complainant, but continued the business and purchased his beer from another brewer. —

Upon filing the bill, November 27th, 1905, with affidavits annexed, an order to show cause, returnable on December 5th, was made, without *interim* restraint. On that day the defendant filed his answer with several affidavits annexed, in which he admits the loan of the money for the purposes mentioned; and that he was at that time requested to sign such an agreement as that set out in the bill and positively declined to sign it; and that if his actual signature was annexed to the agreement it was procured by fraud and made upon some subsequent occasion; and he says that he declined to sell the complainant's beer because he could sell the beer of other brewers to a greater advantage and with better profit.

· The answer further sets forth that at the same date the defendant executed a chattel mortgage to the complainant with a note payable on demand. It sets out the chattel mortgage as an annex to the answer, and it appears to contain an agreement on defendant's part to do certain things, among others that he will not sell any beer except that manufactured by the complainant.

On the filing of this answer and the affidavits annexed the complainant asked leave to file rebutting affidavits, and the hearing was for that purpose adjourned to the 19th of December.

On that day, beside the reading of the affidavits, the vice-chancellor, by the consent of the counsel for the defendant, compared the signature to the alleged agreement with the admitted signatures of the defendant to the bond and mortgage covering the house and lot and the chattel mortgage and promissory note, and expressed his belief upon that comparison in connection with the several affidavits, that the signature was genuine, and thereupon an order for an injunction and *interim* restraint was made.

Subsequently the defendant, or some one in his behalf, tendered to the complainant the sum of $4,800 with interest in payment of the promissory note secured by the chattel mortgage, and the complainant accepted such payment and delivered up the chattel mortgage and note and released the real estate from the lien of the mortgage upon it.

The defendant then set up such payment in an amendment to his answer, and by a cross-bill prayed that the contract might be declared no longer binding upon him.

The complainant by replication admits the payment of the money on the 26th of December, 1906, after the filing of the defendant's original answer and after the issuing of the order for *interim* restraint, and denies the allegation that the amount of the mortgage was ever tendered to complainant prior to that time. The cause was brought to final hearing May 31st, 1906.

*Mr. Herbert Boggs,* for the complainant.

*Mr. James C. Connolly* and *Mr. Alfred A. Stein,* for the defendant.

PITNEY, V. C.

The only questions of fact and of law raised by the pleadings are—*first,* whether the agreement set out in the bill was entered into by the defendant intelligently, and *second,* whether, if it were so entered into, in view of the fact that the defendant, or some one in his behalf, has discharged the pecuniary obligations to the complainant incurred at the same time the contract was entered into, it is still binding on the defendant.

The question of the jurisdiction of this court to enforce by injunction the negative covenant contained in the agreement was not raised either by the pleadings or on the order to show cause, and was raised for the first time at the hearing.

The question of fact was determined by me on the spot at the hearing in favor of the complainant, for reasons stated orally, substantially as follows:

Prior to about the 1st of August, 1905, one Frederick Schwitzgabel was the owner of a house and premises at No. 73 Florida street, Elizabeth, N. J., and there conducted a beer saloon, and was a customer of the complainant, and was indebted to it for a balance on current account, for which complainant held, as usual in such cases, a chattel mortgage.

Early in August, 1905, the defendant, Nizolek, negotiated with Schwitzgabel to purchase the premises and saloon, and they seem to have agreed upon the price. But the defendant had not sufficient ready money or capital to complete the purchase, whereupon, naturally enough, resort was had to the complainant.

It was not the business of the complainant to loan money on bond and mortgage except in aid of the extension and maintenance of its business as a brewer.

A visit to complainant's place of business brought the defendant and Schwitzgabel in contact with the complainant's agents, Messrs. Stengel, one of whom is the president of the complainant corporation and the other a sub-officer, and with Mr. Southerland, who is, or was at the time, the general bookkeeper of complainant, and had charge of the department which made loans to customers. The defendant spoke English with difficulty, if at all, but probably, as appeared at the hearing, understood it a little better than he could speak it. He was accompanied upon his visits to complainant's office by Schwitzgabel, who did understand English. At that interview the amount complainant would loan was fixed at $4,800, which amount was accepted by Schwitzgabel, but the parties were given clearly and distinctly to understand that the loan would be made only upon condition that the defendant would enter into a covenant to purchase his beer of complainant and no one else

for a period of five years. The evidence was entirely satisfactory to me on that point.

Directions were then given by complainant to a title guarantee company, whose representative in Elizabeth was Mr. A. H. Cornish, a counsellor-at-law, to examine the title and superintend the transaction on behalf of the complainant.

He examined the title and the parties met at his office in Elizabeth on the 16th of August, 1905, to complete the transaction. There were present Schwitzgabel and his wife, the defendant and his wife, and defendant's counsel, Mr. Louis Graaf. No one represented the complainant except Mr. Cornish. While there assembled a messenger arrived from complainant's office bringing the draft for $4,800, a chattel mortgage and promissory note, the contract in question, and a letter of instructions in these words:

*"Fidelity Trust Co., Elizabeth, N. J.:*

"GENTLEMEN—Enclosed please find our check for $4,800, which is to be loaned to Joseph Nizolek, at six per cent., to be secured by first mortgage on property No. 73 Florida St., Elizabeth, N. J. We are to receive as collateral security a chattel mortgage for the same amount; also, note, form of which we enclose. In addition to this Nizolek is to enter into an agreement by which he agrees to use our lager beer, ales and porter, exclusively for a period of five years, and to further agree that he will not dispose of his business unless his successor is accepted by us as a customer and will enter into the same agreement. He is to sign a power of attorney on the license, and insurance is to be taken out to protect our loan.

"The costs of search and drawing papers in this matter is to be paid by the mortgagor.

"If the property is free from all liens, you may close the transaction as above.

"Kindly inform Joseph Nizolek that he must pay $5 per week from now on, on account of license.

"Please withhold the sum of $1,300 on account of the indebtedness due us from Mr. Schwitzgabel, which account we shall adjust with him later.

"Yours truly,
"CHRISTIAN FEIGENSPAN,
"A Corporation.
"Per N. SOUTHERLAND."

The papers to be executed were as follows: A deed from Schwitzgabel and his wife to the defendant; a bond and mortgage from the defendant and his wife to the complainant; a

bond and second mortgage from the defendant and his wife to Schwitzgabel; the chattel mortgage and promissory note and the contract. These, excepting the contract, were all executed by Schwitzgabel and wife and by the defendant and his wife where her signature was necessary, in the presence of and witnessed by and properly acknowledged before Mr. Graaf, the defendant's counsel.

The evidence as to the execution of the contract in question is conflicting. That it was laid upon the table with the other papers seems to be admitted. That the date had been left blank by complainant's officer who prepared it is admitted, and there seems to be no doubt that the blank was filled in by Mr. Graaf.

Mr. Cornish, whose manner on the stand was such as to command my confidence in his intention to tell the truth, swears that he saw the defendant sign it, and that he witnessed it at the time, and that he sent it promptly, with such of the other papers as did not need to be recorded, to the title guarantee company, and it found its way immediately to the possession of the complainant.

The money was, in substance, paid at once, and Mr. Cornish swears that while he does not recollect the precise details he is quite sure that he never would have parted with the money or closed the transaction unless the contract had been then and there executed, and in this he is sustained by the letter of instructions.

The evidence of the defendant's witnesses, Mr. and Mrs. Schwitzgabel, the defendant and his wife, and Mr. Graaf, is to the following effect:

That in the course of the actual execution of the papers Mr. Graaf took the contract in question and explained it to the defendant and advised him not to sign it, and that the defendant then and there refused to sign it, and did not sign it, to the knowledge and belief of either of the witnesses, at that time.

The defendant himself admits his signature to the instrument to be genuine, but claims and asserts that he did not sign it at the time of the execution of the other papers, but must have signed it a few days later on a visit which he made to the complainant at its office in Newark.

This explanation, if it might be supposed to be true, does not

account for the signature of Mr. Cornish as a witness, as defendant does not testify that Cornish was present at the actual execution.

But the whole story of a subsequent execution is denied in the most positive manner by the executive officers of the complainant and is completely refuted by all the circumstances as well as the evidence of Mr. Cornish and the executive officers of the complainant. Its object is manifest, namely, to show that the execution of the paper was not a part of the original transaction, and hence that it had no sort of consideration in equity.

Returning to what occurred at the moment of the execution of the papers, Mr. Cornish, as before remarked, does not pretend to recollect the details with minuteness, but swears that his recollection is that Mr. Graaf did advise his client, the defendant, to execute the contract.

I conclude then that there can be no reasonable doubt that the contract was executed at the time that the other papers were executed and before the payment of the money.

There is as little doubt that defendant executed it knowingly and was fully aware of the effects and consequences of the act. In his affidavit annexed to the answer, which affidavit was put in evidence by the complainant, I find the following:

"That a paper was handed him for his signature, and which had been previously read by Graff, and which Mr. Graff explained to him to be an agreement, which, if signed, would oblige him to sell the beers, ales and manufactured products of Christian Feigenspan, a corporation, for a specified period of five years, regardless of whether he was then indebted or obligated to said corporation, and whether he repaid the said loan of forty-eight hundred dollars within five years or not; this deponent then and there refused to sign any such agreement, because it was beyond the understanding he had had with the company, and this deponent further says that he did not sign any such agreement as set forth in the bill of complaint in this cause, and that while deponent and the other persons herein mentioned were still in the office of the Fidelity Trust Company, Abram H. Cornish went to the telephone and called up the office of the Christian Feigenspan brewery, in order to receive further instructions because of the refusal of this deponent to sign said agreement, and that subsequently, when said Cornish returned from the telephone, the transaction was closed without said agreement having been signed.

"This deponent further says that it was because of his inability to read and write the English language that he took the precaution to have Louis Graff read all papers to which his signature was requested."

The evidence of Graff is very positive to the same effect:

"*Q.* Was there any other paper submitted that was not signed?
"*A.* There was.
"*Q.* What paper was it?
"*A.* That was an agreement whereby Nizolek was to bind himself to sell the products of the Feigenspan company for the term of five years.
"*Q.* Did you read that?
"*A.* I did.
"*Q.* After you read that, did you or not explain it to the—I show you the agreement which was submitted on that occasion and ask you if you recognize it as the paper?
"*A.* Yes.
"*Q.* Now, did you read that on that occasion and explain its contents to the defendant?
"*A.* I did."

Mrs. Schwitzgabel's evidence was to the same effect. She says:

"*Q.* You say there was some one paper that Mrs. Graff told Nizolek not to sign?
"*A.* Just one paper, yes.
"*Q.* Do you know what the paper was, or what it was about?
"*A.* Well, he read it to Nizolek and told him it was for five years to bind him to sell. the beer, and not to sign it for five years, and he throwed it aside.
"*Q.* Did he read the paper to Nizolek?
"*A.* Graff read it; yes."

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"*A.* He said: 'Don't sign this paper; it will bind you for five years to sell the beer; don't sign it.' That is what I heard."

And Mrs. Nizolek says:

"*Q.* Did he show them one paper that they must not sign?
"*A.* He did.
"*Q.* Did you understand him?
"*A.* Mr. Graff told them that this was a contract to sell for five years beer of Feigenspan's.
"*Q.* And what did your husband do in consequence?
"*A.* My husband said he wouldn't sign that paper.
"*Q.* Did he sign it?
"*A.* No, he did not.
"*Q.* Did you understand Mr. Graff when he spoke to your husband about that?
"*A.* I did."

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"*Q.* Then, when did you first learn what the paper was about, from

anything that Mr. Graff said, or from what your husband told you after-
wards?

"*A.* I knowed just the very first time when Mr. Graff spoke about it.

"*Q.* Did Mr. Graff say what the paper was—explain?

"*A.* He did.

"*Q.* What did he say?

"*A.* That the contract was to take beer for five years."

I conclude then that the defendant fully understood the nature
and effect of the agreement when he signed it.

The validity of the contract having been thus established, the
question remains what remedy, if any, the complainant is enti-
tled to thereon in this court.

By its bill the complainant asks that the defendant be re-
strained from purchasing his beer from any other brewer, and
tenders itself ready and willing to furnish beer on the usual
terms. There is no undertaking in words in the contract on
complainant's part to furnish beer at any time, but I find no
difficulty in protecting the defendant by a decree which shall
provide that the restraint shall continue only so long as the
complainant shall continue to furnish beer to defendant at rea-
sonable rates and of good quality, and leaving to the defendant
the liberty to apply to be relieved of the restraint if complainant
shall fail in that behalf.

The defence set up for the first time at the hearing, and after
the issue raised by the answer had been inquired into and prac-
tically decided against the defendant, is that this court should
not take jurisdiction of this cause, but leave complainant to his
remedy at law.

If the court actually has jurisdiction, concurrent with the law
courts, of such causes, the general rule is that the defendant
should take his objection to the jurisdiction on the ground here
taken early in the action, either by demurrer or setting it up
specifically in his answer.

This he has not done, but defendant put himself distinctly
and entirely on the ground that he had not executed the covenant
in question.

In several instances, notably *Cutting* v. *Dana, 25 N. J. Eq.
(10 C. E. Gr.) 265* (at *p. 273*), the court has held that having
so experimented and been beaten on the merits defendant ought
not to be permitted to raise the question of jurisdiction as he did.

But I am not disposed to enforce that rule against the defendant in this instance.[1]

The covenant here in question is not an uncommon one. Such covenants have been used in England for more than half a century and are in common use in this country, and the question of their enforcement in this court is an important one, and should be considered on its intrinsic merits.

I will inquire, first, has the covenant a proper consideration? It was, as we have seen, a part of the whole transaction, which is similar to many others entered into between parties situate as are these here.

The defendant being desirous of entering into the business of keeping a liquor and beer saloon, and to commence that business under favorable circumstances, attempted to buy out Mr. Schwitzgabel, who was the owner of an old-established house and saloon in Elizabeth, and was willing to sell it. But defendant had not the requisite capital, and appealed to the complainant to assist him, under the circumstances which I have previously stated. The complainant advanced the money, and, as a part of the transaction, exacted from the defendant the covenant in question. It is fairly inferable from all the circumstances, and in fact the evidence shows, that the amount of money advanced was large in comparison with the value of the premises, much larger than an ordinary person willing to invest on bond and mortgage would have been willing to advance. The complainant then incurred both trouble and risk in the transaction and was willing to do it for the sake of advancing its business interests. It is a well-known fact that all the great successful breweries of the country are obliged to enter into such transactions in order to maintain their business. Hence it seems to me that the covenant had, in its inception, a consideration, which, for purposes of enforcement in a court of equity, must be considered as valuable. It is under seal and admits a consideration.

But in answer to this the defendant proves that after suit brought and after the *interim* restraint was granted he procured another brewing company to pay off the complainant in full, thereby relieving the complainant of all further risk. Ap-

parently the complainant was obliged to accept the payment because it had taken a promissory not payable on demand.

Of course we all know that upon such payment the party advancing the money assumed, by defendant's consent, the same attitude toward him that the complainant had held. That the money was advanced by another brewing company was taken as a fact at the hearing, and so the cause developed into a contest between two brewing companies as to which should control defendant's trade.

At first I was inclined to think that this satisfaction of complainant's debt ought to be considered and given prevailing weight in determining the enforceable qualities of the covenant. But further reflection and argument of counsel lead me to the conclusion that such a result is not justified.

The question is what was the original enforceable character of this covenant, and if it was an enforceable covenant at the time it was made I am unable to perceive how that quality was lost by the voluntary payment of the debt. The covenant itself does not provide for any such contingency. It might have done so. Defendant's counsel might have exacted such a condition.

The original bond and mortgage on the land was given for one year. The accompanying chattel mortgage and promissory note, given as collateral, expressly provide that it should become due if the defendant should buy beer from any one besides the complainant.

But the defendant says that the complainant did not, in express terms, agree to wait upon him for the five years for the payment of the money mentioned in the covenant.

The only importance of that circumstance seems to me to be this: That if the complainant should at any time before the expiration of the five years, enforce the mortgage for any reason except the non-payment of the interest, that act would be of itself a discharge of the defendant from the obligation of his covenant. For it seems to be well settled by the authorities in cases of this character that the defendant's obligation is based upon the assumption that the complainant will continue to supply the material which he desires to sell and will forbear to collect the money which it has loaned.

I think then that nothing that has been proven by the defend-
ant shows any defence to the action.

There was no attempt to prove that the beer furnished was of
a poor quality or the price an unusual one. In fact, as before
observed, defendant knew what sort of beer he would get from
complainant, for his predecessor in title had been selling Feigen-
span's beer and the saloon was a Feigenspan saloon.

The more serious defence set up in argument by the defend-
ant is that this is in effect a bill for the specific performance of a
contract, and that the court will not enforce it but leave the
complainant to his remedy at law.

The practice of enforcing negative covenants by this court is
well established, and is a part of the growth of equity jurispru-
dence to meet and keep up with the growth and development of
business methods.

The policy of the law is that business men should keep their
contracts, and not turn the contractee over to the uncertain
remedy of an action at law for damages for non-performance.
It is, in my judgment, one of the most important functions of
courts of equity to prevent injuries which result in damages, in
all instances where it is practicable to do so, and the tendency is
toward extending the protecting power of the court to cases not
formerly thought to be sufficient to invoke its action.

For myself I think this tendency is wholesome.

Negative covenants of the particular kind here in question
have been enforced more than once.

In *Catt* v. *Tourle (1869)*, Vice-Chancellor Stuart dealt with
such a case, as reported in *38 L. J. Ch. 401.*

The headnote states the case thus:

"On the occasion of a conveyance by the plaintiff (who was a brewer)
of land to trustees in fee of a building society, of which the defendant
(also a brewer) was a member, the trustees (the purchasers) covenanted
with the plaintiff that 'he, his heirs and assigns, should have the exclusive
right of supplying all ale, beer and porter which might be consumed in
every house or other building which might be erected on the said piece of
land, and which should be opened or used as an inn, public house or beer
shop.' The defendant, with notice of the covenant, opened a public house
on the land and supplied it with ale, &c., of his own brewing. The
plaintiff then filed a bill against the defendant alone for an injunction to
restrain the breach of the covenant. The defendant demurred. *Held,*

that the covenant was not invalid, on the ground either of uncertainty, want of mutuality, or as being in restraint of trade, and the demurrer was overruled, with costs."

The learned vice-chancellor used the following language:

"The next important objection to this covenant was that there is no mutuality in it. In a covenant of this kind mutuality is not necessary at all. The books abound with cases in which covenants are entered into with brewers by the lessees of public houses that they will consume no other beer upon the premises than the beer supplied by those brewers. In none of those cases is there ever a covenant on the part of the brewer to supply beer, nor has it, in any of those cases, been ever held that the want of a corresponding covenant on the part of the lessor or owner of the house to supply the beer vitiates the covenant by the occupier that he will exclusively use certain beer to be consumed upon the property. Therefore, upon the ground of mutuality, viz., that there is no covenant on the part of the plaintiff that he shall supply the beer, there seems to me to be no objection whatever to this covenant.

"The last objection was that the covenant is bad in law, because it is a covenant in restraint of trade. The cases in which courts of law and equity have held that covenants in restraint of trade are bad, are cases in which those covenants have so extensive an operation as to cause public detriment. No such objection has ever been raised, in any of the cases in the books that I have referred to, to the covenants entered into with the owners of public houses, by lessees, to have their beer exclusively supplied by those persons. Nor could any such objection be raised in those cases, because the public are not affected to that degree which is requisite for the application of the principle making contracts clearly in restraint of trade to be bad. This covenant is a covenant between one individual and another with reference to the beer to be consumed in one particular house. Covenants of this kind are not confined to the consumption of beer—for instance, they may be covenants that all corn shall be ground at a particular mill. All those covenants are in restraint of trade, but are not such an extensive and general restraint of a public right as to be obnoxious to that principle of law which declares

that covenants too general in restraint of trade áre injurious to the public, and therefore to be considered bad."

An appeal was taken to the court of appeals, as reported in *L. R. 4 Ch. App. 654 (1869)*. The question was elaborately argued and the action was sustained by both the lord-justices.

It will be observed that in that case there was no express negative covenant.

In the course of his judgment Lord-Justice Selwin remarked: "And then, with respect to this particular covenant, it seems to me that the court cannot but take judicial notice of its being extremely common. Every court of justice has had occasion to consider these brewers' covenants, and must be taken to be cognizant of the distinction between what are called free public houses and brewers' public houses which are subject to this very covenant. We should be introducing very great uncertainty and confusion into a very large and important trade if we were now to suggest any doubt as to the validity of a covenant so extremely common as this is."

Naturally, in the course of the argument, the great case of *Lumley* v. *Wagner, 1 DeG., M. & G. 604,* was mentioned and discussed, and numerous others in the same line.

*Catt* v. *Tourle* has never been overruled or doubted, but was followed ten years later by Justice Fry (afterwards Lord-Justice Fry, and author of Fry on Specific Performance) in *Luker* v. *Dennis, L. R. 7 Ch. Div. 227 (1878)*. That also was a suit by a firm of brewers against a publican to restrain him from purchasing the beer sold by him at his public house in violation of a covenant by which the complainant alleges he was bound. In that case, as in *Catt* v. *Tourle,* there was no negative covenant.

There the question was raised and discussed as to what the effect would be of the complainant's failing to furnish good wholesome beer. On that subject Justice Fry said: "It is, in my opinion, a covenant conditional on a supply being made by the plaintiffs of good marketable beer. Various expressions are used in the cases which have been referred to, but I think they all really amount to the same thing. In one case the term 'good and wholesome beer' is used, in another 'good and marketable beer.' I see no objections to any of these expressions."

Another case in which *Catt* v. *Tourle* was cited before Justice Fry is *Donnell* v. *Bennett, L. R. 22 Ch. Div. 835 (1883)*. There a manufacturer of fertilizer, the plaintiff, made a contract with one Cormack, a fish-curer and smoker, by which it was agreed that Cormack should sell and the plaintiff buy all the refuse fish not used by Cormack at a specified price per ton for two years, and Cormack agreed that he would not sell any such parts to any other manufacturer whatever. In breach of that agreement Cormack entered into a contract to deliver fish parts to the defendant Bennett. The suit was to restrain Cormack from selling and Bennett from buying. The question was raised whether, as that was a case which it was assumed was one which involved a continuous contract which the court would not enforce by specific performance, it would enforce the negative covenant. Mr. Justice Fry, after hearing the arguments and going over the authorities, says: "That is the way in which the direct authorities stand in cases in which there is a negative clause, and they appear to me to show that in cases of this description where a negative clause is found, the court has enforced it without regard to the question whether specific performance could be granted of the entire contract."

This is in exact accord with the decision of Chancellor Zabriskie in *Manhattan Manufacturing Co.* v. *Stockyard Company, 23 N. J. Eq. (8 C. E. Gr.) 161.*

Returning to the English cases we have the very recent one of *Metropolitan Electric Supply Co.* v. *Ginder, L. R. 2 Ch. 799 (1901).*

There the defendant, an owner of a hotel in High Holborn, London, applied to the complainant for a supply of electricity and entered into an agreement as follows:

"The consumer agrees to take the whole of the electric energy required for the premises mentioned below from the company for a period of not less than five years." Shortly afterwards defendant ordered the complainant to disconnect their apparatus and made an arrangement to get a supply of electricity from a rival company. An action was brought for an injunction and was dealt with on final hearing. It will be perceived that there was no express negative covenant. The learned judge (Buckley),

after stating the case, goes on to show in what cases an affirmative covenant may amount to a negative covenant, and held that the effect of the covenant in that case was the same as if it were in words of a negative covenant, and granted the injunction prayed by the plaintiff.

I have cited these few from many English authorities because they are specially in point in the present case. It is worthy of remark that while in *Catt* v. *Tourle* and *Luker* v. *Dennis* the covenant sued on was found in a conveyance or demise of land, in the other cases, which followed those, that element does not appear, and none of the decisions rest in any degree upon that circumstance.

Of course, the great case which has set the pace for later decisions is *Lumley* v. *Wagner, supra,* decided by Lord St. Leonards in 1852 against the argument of the most able barrister of the day, Sir Richard Bethel, afterwards Lord Westbury. Mr. Perkin's edition (Boston) of that report, printed in 1871, shows a great number of cases in which it has been followed.

Coming to our own state we have the case previously cited of *Manhattan Manufacturing Co.* v. *Stockyard Company, supra.* In that case there was a contract between the complainant and the predecessor in title of the defendant, by which the complainant had the exclusive right of taking all the blood of animals slaughtered in an abattoir, and also the animal matter and ammonia from the rendering tanks. This contract was broken by the defendant. A bill was filed for an injunction and the injunction was granted. The headnote states that such injunction is not mandatory. It does not require the delivery of the blood, but restrains the defendant from permitting any other but the complainant from taking it. Chancellor Zabriskie holds the remedy at law inadequate, using this language: "For this injury there is a remedy at law, but it is not an adequate remedy. The value of the blood is no measure of the injury, and it is hardly possible to compute the damages which the injury may occasion. And redress at law could only be obtained by a continued series of suits through the twenty or forty years of the complainant's term. It is a case peculiarly proper for the preventive remedy by injunction."

He refers to *Shreve* v. *Black, 4 N. J. Eq. (3 Gr. Ch.) 177.* A reference to that case and to Chancellor Green's note to *West* v. *Walker, 3 N. J. Eq. (2 Gr. Ch.) 279,* will show, what is now perfectly well settled, that in considering the question of what is an adequate remedy at law the courts will take into consideration not only the question of multiplicity of suits, but also the pecuniary responsibility of the defendant.

It is all very well to say you can sue and recover your damages. But can you collect the damages after you have recovered them? And this is one of the important elements in support of the doctrine that it is better to prevent an injury than to give damages for its infliction.

In the same direction is a case in this court similar to *Metropolitan Electric Supply Co.* v. *Ginder, supra—Western Union Telegraph Co.* v. *Rogers, 42 N. J. Eq. (15 Stew.) 311.* The case is valuable on account of its citation of authorities on *p. 314.*

Coming to the present case we have these elements bearing on the question of an adequate remedy at law:

*First,* the difficulty of ascertaining and proving in an action at law the amount of beer which the defendant has sold.

*Second,* the profit which the complainant would have made on an equal amount of beer. On this item the difficulty rests in distributing the items of cost, consisting of the interest of the costs of the plant, the wear and tear of it, the cost of administration, the actual cost of material and manufacture.

In the *third* place is the consideration of the multiplicity of suits necessary and proper to give the complainant proper satisfaction.

In the *fourth* place is the uncertainty of the pecuniary responsibility of the defendant. The proofs show, incidentally, that it is slight.

All these combine to render it well-nigh axiomatic that in such cases the remedy at law can, with rare exceptions, never be said to be adequate, and support the general proposition which I have previously advanced, that the policy of the law should be to prevent a man from breaking his contracts rather than to leave the injured party to his damages at law.

The subject of the effect of the necessity of the complainant bringing a series of suits at law to complete his remedy at law is dealt with by Professor Pomeroy (*Pom. Eq. Jur.* § *243*), as follows:

"The multiplicity of suits to be avoided, which are generally actions at law, shows that the legal remedies are inadequate, and cannot meet the ends of justice, and therefore a court of equity interferes, and although the primary rights and interests of the parties are legal in their nature, it takes cognizance of them, and awards some specific equitable remedy, which gives, perhaps in one proceeding, more substantial relief than could be obtained in numerous actions at law. This is the true theory of the doctrine in its application to the two jurisdictions."

And in classifying the cases he states the present case under class one in section 245, as follows:

"1. Where, from the nature of the wrong, and from the settled rules of the legal procedure, the same injured party, in order to obtain all the relief to which he is justly entitled, is obliged to bring a number of actions against the same wrong-doer, all growing out of the one wrongful act and involving similar questions of fact and of law. To this class of cases belong cases of nuisance, waste, continued trespass, and the like."

And in section 250 he says:

"It follows as a necessary consequence—and this point is one of great importance to an accurate conception of the whole doctrine—that the existing legal relief to which the plaintiff who invokes the aid of equity is already entitled need not be of the same kind as that which he demands and obtains from a court of equity. On the contrary, it may be, and often is, an entirely different species of remedy."

This doctrine was applied by Chancellor Runyon in *Shimer* v. *Morris Canal and Banking Co., 27 N. J. Eq. (12 C. E. Gr.) 365.*

That was a bill for the specific performance of an agreement between the complainant and the defendant as to the mutual continuous use of the waters of a creek. It charged the defendant with the violation of that contract, prayed an injunction to restrain the defendant from continuing to violate the agreement, and that the defendant might be decreed to perform the agreement specifically.

The learned chancellor says (*p. 365*): "It is clear that the

complainants have not an adequate remedy at law. The injury complained of is, in its nature, a continuing one. The remedy at law must, therefore, be by successive suits, if the defendants persist in inflicting the injury. It is, therefore, in this respect wholly inadequate for the protection of the complainants' rights, and it obviously will not answer the purposes of justice."

It is true that the case just cited, and most of the cases in this country which the court has seen fit to relieve against the necessity of bringing a multitude of suits, have related to interests in real estate, but the principle is the same.

The object of the contract here in question, and others like it, is to support and maintain a going business, and naturally and necessarily mere damages for detracting from a part of that business can hardly be said to be an adequate compensation for the injury.

The necessity and propriety of bringing a multitude of actions in the present case seems to me to be too plain for argument. The injury is a continuing one and liable to be such for a period of five years. To say that the complainant must not only accomplish the very difficult if not hopeless task of keeping account and preserving the proof of the amount of beer sold by the defendant for all that period, or even for one year or two years, and then sue to recover its damages, seems to me to be a mockery. The continuing character of this injury seems to me to be of itself, according to well-settled principles, a sufficient ground for the interference of the court.

But the defendant relies on the very recent case of *Sperry & Hutchinson Co.* v. *Vine,* decided by the court of errors and appeals and reported in *66 N. J. Eq. (21 Dick.) 339.* The opinion of the court below in that case has not been published, so far as I have been able to ascertain, but the bill was dismissed on the construction of the contract and the conduct of the complainant.

The opinion on appeal does not state how long the contract had to run (I am informed it was for one year), but the substance of the contract was that the defendant agreed to buy trading stamps of the complainant and not to use any other trading stamps, and the bill was filed to restrain them from so

26

doing. The learned judge who spoke for the court held that it was not necessary to consider the ground upon which the decree of dismissal was put in the court below, but says: "The injury to the complainant is the loss of a market for their stamps and consequent loss of profit. *There can be no difficulty in ascertaining how many of the complainant's green trading stamps would have been required if their place had. not been supplied with their competitor's red star stamps,* and the complainant's profit thereon must be a matter of calculation. Assuming that the complainant has a legal right the remedy at law is adequate."

I am not aware that the nature of the trading-stamp trade, with what may be termed its true inwardness, is a matter of common knowledge. I confess my ignorance of it, and hence am not able to reason from that case to the present case. But from what little knowledge I do have of that modern retail mercantile device I should be ready to agree with the result arrived at on the ground that the device is a sort of fraud on the public, and contracts of the character there set out should not be enforced on grounds of public policy. Be that as it may, I might have been able to have measured the full force of the decision *if it had been explained in the opinion how the complainant would have had no difficulty in ascertaining how many of complainant's green stamps would have been required.*

If the contract was for one year that feature alone distinguishes it from the present case, and presumably the defendants were abundantly able to respond in damages.

As the case is reported I do have difficulty in applying it to this, and cannot consider it as governing it, especially in view of the more recent case of *Meyers* v. *Steel Machine Co., 67 N. J. Eq. (1 Robb.) 300; affirmed,* on the opinion below, in *68 N. J. Eq. (2 Robb.) 795.* That was a contract by which the defendant agreed to sell to the complainant all of certain machines which the defendant should manufacture, provided the complainant should purchase all the defendant should make. The third headnote is this:

"When a contract requires the· defendant to do for the ˙complainants, exclusively, some act calling for the exercise of skill or artistic capacity,

equity will enforce the negative side of the agreement and will restrain the defendant from giving his services to any other than the complainants for whom he agreed to work, but it will not make a mandatory decree to compel the defendant to exercise his skill in specifically performing the contract."

The bill was filed to restrain the defendant from selling the machines to any other person. The cases wherein courts of equity will enforce negative covenants was discussed by Vice-Chancellor Grey in his opinion (*p. 314*), and treated in a satisfactory manner, and the result is a good illustration of the present limits of the rule governing courts of equity in such cases.

In the same direction is the very recent opinion of Vice-Chancellor Bergen in *Taylor Iron and Steel Co.* v. *Nichols, 70 N. J. Eq. (4 Robb.) 541.*

Reference is made by defendant's counsel in his argument to what was said by me in *O'Brien* v. *Paterson Brewing and Malting Co., 69 N. J. Eq. (3 Robb.) 117,* but the circumstances of that case and the present are quite different and the language used does not cover the present case.

The defendant herein, in his written argument, expressly disavows any contention that the contract is open to the criticism of being in restraint of trade.

He does make the point that the contract is not enforceable by reason of its lack of certainty. That point is covered incidentally by the several authorities which I have cited. The business of supplying malt liquors to a beer saloon is a familiar one and its course well known, and the contract must be construed accordingly. The rule is well settled that in contracts of this character the brewer, by implication, agrees to supply in the ordinary course of trade beer of a good quality at reasonable prices and on the usual terms as to delivery, payment, discounts and the like. The present case presents no disagreement between the immediate parties to the suit on any of these points, but, as before remarked, it has developed into a bare contest between two rival brewers which shall supply the defendant's beer saloon. I thought, and still think, that the complainant was entitled to relief and advised accordingly.

### ADDENDUM.

Since preparing the foregoing my attention has been called to the case of *Mausert* v. *Feigenspan, 68 N. J. Eq. (2 Robb.) 671.* It appears by the fourth section of Vice-Chancellor Emery's opinion, found on *p. 675,* that he there granted an injunction similar to that which I have advised in this case. And as I infer that the appeal was from all parts of the decree, I think that the unanimous affirmance of that decree is not without significance.