CHRISTIAN FEIGENSPAN, a corporation,

*v.*

THOMAS P. O'NEILL.

[Decided October 19th, 1911.]

There being no status to be preserved a preliminary injunction will not be granted enjoining the breach by the defendant, a saloonkeeper, of a covenant to sell the complainant brewing company's beer exclusively for five years, the consideration of which was a loan payable on demand secured by a chattel mortgage, assignment of the saloonkeeper's lease and license and .everything he had.

On bill, &c. Motion on bill and affidavits and answering affidavits for a preliminary injunction, enjoining the breach by the defendant, a saloonkeeper, of a covenant to sell complainant's beer exclusively for five years, the consideration of which was a loan secured by the chattel mortgage, &c., payable on demand.

*Mr. John F. Marion* and *Mr. Herbert Boggs,* for the motion.

*Messrs. Hamill & Cain, contra.*

STEVENSON, V. C. (orally).

I shall dispose, first, of the application for an injunction in the case of Christian Feigenspan, a corporation, complainant, against Thomas P. O'Neill. My conclusion is that this is not a case for a preliminary injunction. And I reach this conclusion without forming any positive opinion whatever in regard to the merits of the very important questions which have been argued— and very well argued—by counsel on both sides.

I did expect to state this morning, in as orderly way as possible, the questions which have been discussed and which will come up for further argument, of course, upon final hearing; but although I have the papers here before me, the facts have

largely gone from my mind—very few of those facts being neces-
sary for the determination of one or two points which I held
under advisement. I can say, though, that my mind is quite
open in regard to how this matter will be disposed of upon final
hearing. The only point I now decide is, that this is not a
case for a preliminary injunction.

There is no status to be preserved. The complainants, this
brewing company, wish to prevent the defendant, the saloon-
keeper, from selling any but their—the complainants'—beer for
five years from the date of this contract. If they have a right
to this customer for the output of their beer they will be put to
some loss by reason of being deprived of that advantage while
this suit is pending, but the amount of their loss is ascertainable
very closely indeed—very accurately. The number of barrels of
beer which this man sells now is known to the complainant. In
one of the affidavits on the part of the complainant, they state
the number of barrels of beer he has sold during each of several
months, and it is a matter of almost common knowledge that
the profit on a barrel of beer is well known. It is a definite sum.
The amount which the complainant stands to lose if it is de-
prived of this customer while this suit is pending is compara-
tively a small amount, easily ascertained. I do not recall—
although on this point I should need to look through the papers
again—I do not recall that there is any very satisfactory evi-
dence that the defendant, O'Neill, is not responsible for the
largest amount that could be recovered.

Now, in that situation of affairs, with nothing burning up,
nothing of value to be destroyed, no status to be altered, the
court is asked, preliminarily, to practically adjudge all these
questions in favor of the complainant and compel this man to
elect either to return to the brewery from which he has separated
himself and undertake to do business again with that brewery
while the litigation between himself and the brewery is going on,
or go out of business.

This is a very peculiar contract. It is not a contract which
compels the defendant to buy the complainant's beer while the
defendant occupies premises under a lease from the complainant.
It is not a covenant in partial restraint of trade which is attend-

ant upon the sale of anything—the letting of anything. And, more than that, it is not a contract which compels the saloonkeeper to sell only the beer of the brewery while the debt from the saloonkeeper to the brewery remains unpaid. Perhaps there can be no question whatever about the fairness of that sort of a contract, which is a very common one indeed.

The brewery loaned Mr. O'Neill, the saloonkeeper, $2,500 and took back a chattel mortgage and an assignment of his lease and license and everything he had, as security, the loan drawing six per cent. interest. If they had done as brewers used to do, the provisions of the contract would have been that while the debt was unpaid O'Neill should sell exclusively the beer of the brewery.

But this contract goes beyond that and provides, in consideration of this loan, secured by chattel mortgage, note on demand, assignment of the lease and assignment of the license, that O'Neill shall sell the complainant's beer exclusively in this place or any other place where he may move his business to—anywhere in the United States—for five years. And, more than that, it provides that he shall not, at any time within the five years, be permitted to sell his business—his own property—four years after this debt has been paid perhaps, to anybody without exacting from that person a similar covenant.

Well, it may be that this court will find itself obliged by the decision of Vice-Chancellor Pitney, in the case of *Feigenspan* v. *Nizolek, 65 Atl. Rep. 703,* to specifically enforce the negative provisions of this contract by injunction. It may be that upon final hearing, whatever my own views may be in regard to what the law ought to be, I shall find my decision absolutely controlled by this *Nizolek Case.*

I have grave doubts about the propriety of enforcing in courts of equity the specific performance of this sort of a contract in restraint of trade—a contract which does not attend upon the sale of anything and endures after it has ceased to secure or in any way protect a loan—a contract which puts a poor and ignorant retailer in a relation of commercial servitude to a rich and powerful wholesale dealer. It is somewhat startling to consider that a poor borrower, in consideration of a loan

to him at six per cent. per annum, secured by all the property that he has, may also lawfully bind himself for a term of years to buy beer, or bread, or clothing, or any other article of consumption from the lender exclusively. Yet it must be conceded that the case of *Feigenspan* v. *Nizolek,* as decided in this court and also in the court of errors and appeals, is very nearly on all-fours with the case now before this court, and it may, therefore, be the duty of this court merely to follow that case.

But I do not have to go into this question now, I do not have to make up my mind independent of authority what the rule ought to be; nor do I have to make up my mind how far I am controlled by the decision of Vice-Chancellor Pitney, in the *Nizolek Case,* because in this case there is a doubtful question of fact which did not arise in the *Nizolek Case* at all, and it is of a character that does not connect it in any way with a brewery contract case, but is a feature presented often in all sorts of injunction cases.

The defendant, O'Neill, and a witness—his lawyer—whose credibility is not impeached, testify in substance that they did not know there was any such contract executed, or to be executed, by O'Neill when the great bunch of papers—I think six in number—was presented to him for signature. We have a conflict of testimony on this point. This lies at the base of this whole case. It seems the contract is a blank form which has gradually been evolved in the office of the brewing company or its counsel in Newark to meet the necessities of their business in the best and most practical way. It is evident the contract was modified after the decision in the *Nizolek Case.* In the Nizolek contract there was no covenant on the part of the brewery that they would sell beer at any price. That is pointed out by Vice-Chancellor Pitney. He implies a contract to that same effect, if I remember his decision right.

Now the blank has been changed and a covenant has been inserted compelling the brewing company to sell the defendant beer. The object of that is, of course, perfectly plain. A man of common sense knows that that is no obligation which is a burden upon the brewing company. Of course, they will sell their beer, and want to sell their beer. The part of the contract

which has practical binding force is the contract on the part of the saloonkeeper to buy their beer. This contract, as I said, was elaborated and it is quite an elaborately drawn affair. It was filled out and sent to the attorney for the brewing company who attends to their business in Hudson county—in Jersey City. Besides that, the attorney drew the chattel mortgage, the assignment of the lease and the assignment of the license, and probably the note.

No, I think the note was on a printed form; it almost always is. I rather think the note came from Newark, too. But this contract came from Newark, containing these extraordinary provisions which made this man practically a slave of the brewery for five years wherever he did business and whether he owed this money to the complainant or not, and these papers are presented to him in a bunch in the office of the attorney of the brewing company in Jersey City.

O'Neill, it is true, had counsel with him, but this gentleman makes an affidavit, point blank, that he never saw this contract at all. He saw the other papers and they were explained to Mr. O'Neill when he signed them. Counsel for the brewing company testifies generally that he handed the papers to counsel for O'Neill and that he examined them; that is all. I looked very closely through the affidavits a week or two ago, I recollect, to see what the affidavits on the part of the complainant show on this sharp point—whether this particular contract was read to this saloonkeeper or not—whether he was informed that he was signing in this great bunch of papers any such obligation. He swears positively that he knew nothing about it; that he never would have agreed to any such terms. He was attempting to make a similar deal with another brewery and, of course, we all know that these shifts and changes are made from time to time, and a successful saloonkeeper can get money of any one of the breweries. They are glad to make an arrangement with a new man and be allowed to step into the shoes of the former brewery.

This man swears that he never understood he had personally tied himself down for five years whether the loan was paid back the day after or not, and he is supported in that by this affidavit of his lawyer—an intelligent man and a man who shows that he

has had wide experience with this sort of contract, and in that course of dealing I think he said he had had one hundred and fifty cases and he never knew that this contract was among the papers which his client signed.

In that sort of case it is perfectly plain that the question must be tried out without regard to all the questions of law and equity referred to—this question of fact must be tried to a finish before the complainant will be allowed to come down with this destructive injunction on this man O'Neill, preventing him for five years from running a saloon anywhere in the world, and buying beer from anybody excepting these brewers with whom he is now in litigation.

For the reasons that I have indicated the application for a preliminary injunction will be denied.