Complainant seeks to enjoin the defendant Anthony Galka from selling at the station hereinafter mentioned any gasoline *Page 387 
not manufactured or sold by it and to also restrain the other defendants from interfering with its rights under its so-called "exclusive supply contract" with him.
Among the nearly two hundred gasoline stations supplied in this state by complainant with gasoline was one which is situated on the southeast corner of Paterson Plank Road and Main Avenue, in the Borough of Wallington. In October, 1935, Galka, the lessee and operator of that station, being desirous of improving and modernizing it, sought and obtained from complainant for that purpose a loan of $1,750 and the installation by it, without cost to him, of several tanks, computor pumps, electric pumps, electric sign and other equipment. In consideration of this Galka, on October 14th, 1935, entered into a written "exclusive supply contract" with complainant, whereby, during a period of five years it agreed to supply him with, and he agreed to deal in, advertise and sell at that station only its gasoline, and, in language of that contract, "not to sell or deal in gasoline of any others."
Thereafter, in June, 1939, Galka again undertook the renovation and modernization of that station and again requested complainant to install certain new equipment, which it, however, by reason of the cost entailed, declined to do unless the term of its "exclusive supply contract" was extended; with the result that, on June 9th, 1939, a written contract was made between them, whereby it agreed to supply him with, and he, for a period of five years and, at complainant's option, for an additional five years thereafter, agreed to deal in, advertise and sell at that station, only complainant's gasoline, and "not to sell or deal in gasoline of any others." On the faith of this contract and at considerable expense to it, complainant again installed at that station new tanks, computor pumps, electric pumps, hi-boys, an electric sign and other equipment, and all of which it did for the admitted purpose of maintaining and extending its business, a practice commonly recognized and pursued by its competitors and other large oil companies in order to maintain and extend their respective businesses.
Realizing the desirability of having its gasoline sold at and distributed from this station, defendant Tidewater Associated *Page 388 
Oil Company, hereinafter called "Tidewater," a competitor of complainant, had its representative call upon Galka in the latter part of 1939 or early part of 1940, for the purpose of inducing him to sell its products exclusively at that station, and in connection therewith requested and procured his contracts and lease with complainant and, after the examination thereof, made him a tempting and attractive offer if he would agree to so sell its products.
For the purpose of evolving some scheme whereby he could evade his obligations, as well as defeat complainant's rights, under his said "exclusive supply contract," and thus be enabled to accept Tidewater's said offer to him, Galka admittedly discussed his predicament with his fiancee, defendant Olga Keller, then employed in a handkerchief factory, with the result that the following scheme was then conceived and evolved; Galka was to refrain from seeking a new lease on the station from the defendant Anderson Lumber Company, hereinafter called "Anderson," and also from exercising his option for a two year renewal of his then existing lease with the latter, the initial term of which had yet to run until October 31st, 1940; Anderson was instead to give a lease to Galka's fiancee, who was to sublet to Tidewater; and Tidewater, in turn, was to resublet to Galka who was to agree to sell its products exclusively at said station, whereupon Tidewater was to give its check for $2,000 to Galka's financee, which she, however, was to turn over to him.
In accordance with that plan, Galka subsequently declined to exercise his two year renewal option under his said lease with Anderson; thereupon Anderson, on August 7th, 1940, leased the said premises to Galka's fiancee for the term of five years commencing on November 1st, 1940, at an annual rent of $900, payable $75 monthly, which significantly was the same rental as that specified in Galka's then existing lease with Anderson; Galka's fiancee then, on August 29th, 1940, sublet to Tidewater for five years at the rental of one cent per gallon for each gallon of Tidewater's gasoline sold on said premises, subject to a minimum rental of $60 per month; Tidewater thereupon immediately resublet to Galka for the same five years at the rental of one-half of a cent per gallon *Page 389 
for each gallon of its gasoline sold at said premises and which he undertook to sell exclusively thereat; Tidewater then gave Galka's fiancee its check for $2,000 which she immediately endorsed over to him who deposited it to his credit in his own bank account. During all of these manipulations Galka uninterruptedly continued, as he had theretofore, and still continues, in possession of this station as the lessee and operator thereof.
While the evidence fails to demonstrate that defendants, Tidewater and Anderson, participated in any of these transactions with notice or knowledge of their fraudulent purpose of design — and, hence, as to them necessitates a dismissal of the complaint — it does, however, overwhelmingly establish that those transactions were part and parcel of a fraudulent scheme conceived and carried out by Galka and his fiancee, neither of whom took the stand, although both were present throughout the trial, by means of which they hoped to effect his escape from his obligations, as well as the defeat of complainant's rights, under its last mentioned "exclusive supply contract" with him, so as to enable him to obtain the $2,000 from Tidewater.
In view of the undisputed fact that Galka, prior to and throughout the execution of the above mentioned fraudulent transactions was, and ever since has continued to be, in the uninterrupted control and possession of this station as the lessee and operator thereof; that complainant's "exclusive supply contract" with Galka, embodying his here considered negative covenant, had yet to run until June 9th, 1944, and, at complainant's option, until June 9th, 1949, thus presenting, as it here does, the extreme difficulty of presently ascertaining and proving the amount of complainant's gasoline which he will sell until then and the amount of the profit which would have been realized by complainant therefrom; and in further view of the necessity of multiple suits and the ultimate uncertainty of Galka's pecuniary responsibility, complainant is clearly entitled to the enforcement of Galka's negative covenant with it by enjoining him from breaching it during the term thereof,Atlantic Refining Co. v. Kelly, 107 N.J. Eq. 27;151 Atl. Rep. 600; Christian Feigenspan *Page 390 
v. Nizolek, 71 N.J. Eq. 382; 65 Atl. Rep. 703; affirmed, 72 N.J. Eq. 949; 68 Atl. Rep. 1116; Manhattan Manufacturing andFertilizing Co. v. New Jersey Stock Yard and Market Co.,23 N.J. Eq. 161; Western Union Telegraph Co. v. Rogers, 42 N.J. Eq. 311; Earruso v. Town of Montclair, 112 N.J. Eq. 520;164 Atl. Rep. 899; modified, 114 N.J. Eq. 12; 168 Atl. Rep. 398;People's Brewing Company of Trenton v. Levin, 78 N.J. Eq. 583;81 Atl. Rep. 1114, and also to have his fiancee enjoined from doing any act or thing designed or intended to interfere with its rights under that contract.
Nor should there be any hesitancy on the part of this court, considering the facts and circumstances before it, to specifically enforce the negative covenant against Galka, even though he, in violation of that covenant, saw fit to enter into an agreement with Tidewater for the exclusive sale of its gasoline at that station, and to whom he consequently may have to respond in damages, if he, in being compelled to keep faith with complainant, is obliged to perform his negative covenant with it;People's Brewing Company of Trenton v. Levin, supra; since he can neither ask nor expect this court to save him from himself or his own acts.
There will be a decree in accordance with the views hereinabove expressed. *Page 391