THE MORRIS CANAL AND BANKING COMPANY, THE LEHIGH VALLEY RAILROAD COMPANY, and THOMAS OAKES, DAVID OAKES and GEORGE A. OAKES, partners, &c.,

*v.*

THE DIAMOND MILLS PAPER COMPANY.

[Submitted August 10th, 1906. Decided September 1st, 1906.]

1. A verbal protest against defendant's act in discharging refuse from a paper mill into a canal was inefficient to arrest the running of time for the purpose of acquiring an easement to make such discharge by adverse user.

31

2. Where the operators of a paper mill, located by the side of a canal, who drew water therefrom under a deed, had for years discharged refuse consisting of fibre heavily charged with lime into the canal, which discharge did not interfere with the operation of the canal, and complainant, canal owners, stood by while defendant expended thousands of dollars in repairs and additions to the paper mill in the introduction of new and expensive machinery therein without objecting to the further discharge of such refuse into the canal, they were estopped thereafter to object to the discharge of a much less quantity of such refuse than had previously been discharged.

3. Defendant deposited lime-bearing material from its paper mill in a canal from which the water and refuse was discharged into a river. Complainant, a woolen company, derived its water for dyeing from the river, and the water so charged with lime was thereby rendered unfit for such purpose.—*Held,* that the proximate cause of complainant's injury was the act of the canal company in unnecessarily discharging the water from the canal into the river, and not the act of defendant in discharging its lime-bearing material into the canal.

On final hearing on bill, answer and proofs.

The bill, as originally framed, was filed November 29th, 1905, by the Morris Canal and Banking Company and its lessee, the Lehigh Valley Railroad Company, against the Diamond Mills Paper Company, and the answer thereto was filed January 11th, 1906, and an amended answer was filed March 13th, 1906.

The cause was set down for hearing on the 4th of April, 1906, and on that day the firm of Thomas Oakes & Company, in the name of its individual members, applied for leave to be made parties complainants, on the ground that they were interested with the canal company in the subject-matter and prayer of the bill, and were duly admitted complainants by an order of that date. No change was made in the pleadings.

*Mr. Gilbert Collins* and *Mr. George S. Hobart,* for the canal company.

*Mr. Harry E. Richards,* for Thomas Oakes & Company.

*Mr. Frederick T. Johnson,* for the defendant.

PITNEY, V. C.

The case made by the bill has a double aspect.

In the first place, it charges the defendant with emptying into the canal certain solid matter, which there accumulates and is required to be occasionally removed by the canal company in order to properly facilitate the operation of its canal.

In the second place, it charges the defendant with discharging into the canal certain waters holding lime in solution, which lime water is of no injury whatever to the canal company, but which it finds convenient to discharge into a small stream called Third river, through which the lime water finds its way into the millpond of the complainants Oakes, who are manufacturers of woolen goods for men's wear, and use the waters of their millpond for making dyes, and when the water becomes impregnated with lime above a certain degree it becomes unfit for dyeing purposes.

Oakes & Company complained to the canal company for discharging this lime water into their millpond, and the canal company, by way of defending themselves against this complaint, filed this bill against the paper company. Then, after answer filed, and on the day set for hearing, Oakes & Company applied for leave to be made complainants with the canal company, taking the pleadings precisely as they stood. An order was thereupon made admitting them, against the strong protest of the counsel for the paper company.

I must say that I think it a matter of regret that Oakes & Company did not, in the first instance, file their bill against the canal company, against which, it is not improper at this point to say, they seem to have a perfect case.

Taking up now the case made by the pleadings and proofs we find the following facts:

The Morris canal, as originally constructed, had an unbroken level from a point near Lincoln Park, in Morris county, to Bloomfield, in Essex county, known as the "seventeen-mile level."

At Bloomfield it descended a vertical height of sixty feet by an inclined plane known as "No. 11 east."

The mechanism of the plane is this: An inclined railway

upon which runs a large car or cradle, which runs down into the water at each end and takes on a canal boat, which it carries up or down, as the case may be, from one level of the canal to the other.

The motive power is a water wheel known as the "Scotch motor," being a hollow vertical shaft with hollow arms and openings on one side, from which the escaping water causes the shaft to revolve, which drives a drum, around which is wound a wire cable, which in turn is attached to the car or cradle, and in performing its work passes around a large horizontal wheel lying in a pit at the foot of the plane (also at the head). This pit is sufficiently depressed below the level of the bottom of the canal to receive the car or cradle at a sufficient depth to allow the boat to be floated on and off of it.

This depression in the bottom of the canal was, in the evidence, called the "wheel pit."

In the year 1858 the canal company, finding that it was able to divert from the Passaic river above Little Falls, without being prevented by the water power company of Paterson, more water than it really needed for operating its canal from that point to tidewater, conceived the idea of selling water power at its Bloomfield plane, and in that year granted in perpetuity to one Unangst the right to use what was called the "feed water" of the canal, for an annual rental.

The grant contemplated the use of the water in two sections of over twenty feet vertical fall each.

This grant was acted upon by the assignees of Unangst almost immediately, and about forty years ago a paper mill was established on the lower section, and a paper mill has been there maintained and used ever since, with some slight interruptions, which I will refer to farther on.

By the terms of the grant, all the water used must be returned into the canal at the foot of the plane, and in point of fact, that has been done by the several successions of paper mills which for all these years have occupied the location of the defendant's paper mill.

The defendant came into possession and title in the year 1894.

A previous occupant had failed financially in 1888-1890, and

the mill had lain idle for a considerable period of time. A successful occupant took it about 1890.

When the defendant took possession it immediately expended many thousands of dollars in repairs and additions to the mill necessary for the manufacture of its peculiar product—white tissue paper.

This was done openly and under circumstances which must have brought it to the knowledge of the canal company and its officers. That company was entirely familiar, by many years' experience of a succession of paper mills, with the effect of its operation on the operation of the canal. And if it had any objections to the operation of a paper mill at that point it seems to me it should then have made them, and having stood by while these large expenditures were being made, it is now estopped from asserting that any injury has been done or is being done to it by the defendant's operation.

But to dispose of this part of the case at once I will say that at the earnest request of all parties on April 5th, 1906, I visited the mill plant in their presence and was pointed out the whole operation of paper making from beginning to end, and saw with my own eyes the results. And some of my observations at the time were taken down by the stenographer.

In the course of the manufacture the raw material, composed of the clippings of white linen or other white material, was ground into a fine pulp and in a milky condition was passed over a fine moving wire screen, the object of which is to allow the liquid to escape and the fine fibre to be carried on, dried and made into paper. But the mesh of the screen cannot be made so fine as to allow the water to escape without carrying with it a small quantity of white fibre which is discharged with the water at the foot of the plane. To a casual observer the fibre-laden water appears like lime water. Beside this fibre there is absolutely nothing emptied into the canal by the defendant which can possibly interfere with its operation.

When the canal is substantially idle and the water drawn out, as it is every winter and has been for the whole season for a considerable period of late years, and no boats are moving and the large circular wheel in the wheel pit is not revolving to stir up

the fine and exceedingly light fibrous and fluffy matter, it settles in considerable quantities and turns to a dark gray color.

And here it may be proper to remark that there are several different channels in which the water passes from the upper level to the lower level of the canal.

One is the tailrace of the Scotch motor which carries the boats up and down, and when few, if any, boats are moving, little or no water comes in that way.

Another is the old original byrace which carries the actual overflow of water from the upper to the lower level.

And the third is the tailrace of the turbine wheel which in part drives the machinery of the paper mill. Besides these there is the water actually used in the washers and also beaters, which grind the rags into pulp, and the water which drains off through the wire screens, as before remarked.

Now, the turbine wheels, which are relied upon in part to drive the machinery of the paper mill, are gauged to suit the quantity of surplus water which the canal can furnish when it is in full and active operation. The remainder of the power necessary for driving machinery is supplied by steam.

The result of this situation is that for the last two or three years and more, during which not a third of the number of boats have passed through the canal of what formerly passed through, the inactivity of the water and horizontal wheel at the foot of the plane have allowed a much larger quantity of fibre to stop and settle there than would have been the case or ever had been the case when the canal was in anything like active operation.

Upon the whole case and quite independent of the question of estoppel, I am not satisfied that the canal company is suffering any substantial injury from the operation of the defendant's mill. I will give more in detail farther on my reasons for this.

The contribution of water highly impregnated with lime held in suspension to the canal by the paper company furnishes a more serious question. There is no doubt that up to the time of the hearing the defendant did deliver at the foot of the plane more or less water highly impregnated with lime. Samples taken in January, 1906, and again in March, 1906, and I believe fairly taken, did indeed show no unusual quantity of lime. But sam-

ples of water thickened with fibre taken from the wheel pit in my presence on April 5th, 1906, upon analysis did show a large quantity of lime.

Let us now inquire how and under what circumstances this lime gets into the Oakes' millpond.

The canal at the foot of the plane is several feet higher than Third river, which runs near it, and as the wheel pit is two or three feet deeper than the canal, and, of course, the emptying of the canal does not drain it, in order to drain it an underground conduit is provided leading from its bottom to the edge of the river. In my presence the gate or stop at the upper end of this conduit was opened and the water in the pit permitted to run out into Third river. No evidence at the next hearing on May 26th, 1906, was offered to show that this contribution of lime water affected the hardness of the water at Oakes' mill, though it was quite easy to make the test. All that was shown on this subject was that a discoloration of the water was seen at the head of the pond. Samples of water taken from the pond on May 3d showed no more hardness in the water than usual.

I shall assume, however, that the emptying of that wheel pit, when charged with sludge, into the pond, would have the effect of temporarily making the water at Oakes' mill too hard for use in making dyes.

The evidence of the experts was to the effect that the limit of hardness in water for use in making dyes was thirteen or fourteen degrees of hardness by Clark's test, and that the natural hardness of Third river was from eight to eleven degrees, varying with the seasons of the year, so that there was a margin of softness of in the neighborhood of three degrees. Now the evidence was entirely clear that on several occasions prior to the filing of the bill the water was much too hard for use for dyeing purposes, and the evidence satisfies me that that hardness was due to the emptying of the water from the canal into Third river, and the hardness of the canal water in its turn was due to lime contributed to it by the defendant's paper mill.

The canal crosses Third river just below plane No. 11 by an aqueduct made of planks, being a part of what is called the one-mile level just below plane No. 11, ending in a lock. The

canal company provided this aqueduct with large gates at one side of it by which the water can be conveniently and rapidly drawn out of that one-mile level and into Third river. But I find, as a matter of fact, from the evidence, that it was in nowise necessary for them to empty it at that point.

There was another gate in the side of the canal near or at Second river, on the next level below, where it could be equally well discharged, though perhaps not so rapidly.

But with regard to the water settling in the wheel pit below the plane and below the level of the canal bottom, that could only be discharged by the underground conduit previously mentioned, ending at the edge of Third river and thus necessarily mingling with the waters of Oakes' millpond.

Now, with regard to the sludge, which, while the canal is not in operation, settles and accumulates in the wheel pit. It is composed largely of this very minute white fibre which is given off by the paper machines in the process of manufacture. It is exposed in the process to contact with water highly impregnated with lime held in solution, and seems to have a great affinity for lime and a sort of capacity for grasping and holding it when it subsides, as it does when the canal is not in operation at the foot of the plane and the wheel pit becomes a sort of reservoir for lime. This attraction for lime and capacity to grasp and hold it accounts for the large amount of lime found in the sludge and sludge water, samples of which were taken in my presence, as before stated.

Now, this fibre subsides very slowly and is easily excited by any physical disturbance, and mixes readily with the water above. The proof of the canal witnesses was that while the canal was in operation it was stirred up by the horizontal wheel and carried along for miles by the passing boats and the current of the water, and finally deposited in the bottom of the canal or carried on through to an overflow or outlet. It formed no obstacle whatever to the navigation of the canal, but in years gone by a quantity would naturally in the winter season, as before remarked, accumulate around the wheel in the pit, and in the spring, when the canal was being prepared for navigation, it had to be removed. Now, a very easy mode of removal was to let

down into the wheel pit a heavy flow of water, which was easily done through the tailrace of the Scotch motor and the sidewash, open the lock gates at the end of the one-mile level or in the side of the aqueduct over Third river, stir up the sludge with a rake or hoe, and let it wash down the canal.

I am entirely satisfied, from a careful study of the evidence and an observation of the matter on the ground, that this last was actually done by the canal employes in several instances in the spring of the year, and the whole or the greater part of the contents of this wheel pit emptied into Oakes' millpond, and this mode of disposing of the sludge, highly impregnated with lime, accounts for the fact that the Oakes were troubled with this excess of lime in their millpond only just after one of these annual discharges, the effect being felt, as they swear, on one occasion several weeks.

Now, I find, as a matter of fact, as before remarked, that there is no sort of necessity for the canal company to discharge this accumulation of lime into Oakes' millpond. I find that it can all be driven down beyond the river and pond and deposited where it will be harmless.

I find further, as a fact, that it is entirely practicable for the canal company not only to substantially free the wheel pit of sludge in the manner just stated, but also, by flushing it freely with water, that it may, at any time after such flushing, empty the water left in the pit out into Third river without any appreciable injury to the waters of that river. I doubt if the whole liquid contents of the pit, highly charged as they were with lime, which were discharged into the river on the 5th of April in my presence, had any appreciable effect on Third river. The quantity of water in the wheel pit was too small, in comparison with the size of Oakes' pond, to produce any appreciable effect. A different result, however, might be expected from the discharge into the river of the sludge there deposited, which, as before remarked, contained a large amount of lime ready to be taken up and held in suspension by running water. But that highly-charged water can be easily flushed out by a free discharge of clear water from the upper level into the canal, with the gates of the next lock below opened to insure a free flow. I find, there-

fore, as a fact, that there is no practical difficulty in so operating the canal that practically no lime water shall be delivered by it into Oakes' millpond.

Now, to go back again to the paper mill itself.

The process of making this fine white tissue paper is substantially the same as that which is in use in all paper mills for making nearly all kinds of paper, and was in use in the paper mills which preceded that of the defendant. All paper-making, or nearly all, and all those which preceded the defendant at this point, use chloride of lime in the shape of a bleach. The evidence is clear that those which preceded the defendant used a great deal more than does the defendant, and that formerly they deposited the spent lime, with the rest of their refuse, in the canal. Complaint was made of this lime deposit from time to time, but it was never remedied until about six or seven years before the bill filed herein, when the defendant corporation, having its attention called to this deposit of lime, made an arrangement by which all its spent lime was deposited on its own ground and carted away. I am satisfied that none of it has found its way into the canal or into Third river. This appears by a careful examination of the mill and all its processes, made on the 5th of April, in the presence of all the parties, including one of the Messrs. Oakes and his counsel, Mr. Richards, himself an expert chemist.

In addition to the lime held in solution and grasped, as before stated, by the fine fibre which, escaping through the fine meshes of the endless wire screen, found its way into the canal, there was but one process used by the defendant by which lime, except in fibre, could be contributed thereto by the defendant. That was an instrument called a rotary digester. I have said the defendant company used for its stock entirely the refuse cuttings from shirt factories. These were all perfectly clean, and nearly all pure white. But they did also use some clippings of a figured material for shirts containing colors, and in order to remove these colors, they subjected this material to the action of this digester in contact with a chemical liquid, of which lime, as milk of lime, was a component part.

The amount of lime used in this digester was so small that it

had not been supposed that it could seriously affect the water of the canal. Upon attention being called on April 4th to this matter, the defendant company at once took measures to have even this small quantity of lime separated and kept by itself, and excluded from the canal or the Third river, and those measures were perfected before the final hearing.

It is proper to remark that the liquid which comes from this digester is dark in color, and accounts for the dark color of the refuse sometimes seen coming from defendant's mill in sharp contrast with the usual pure milky flow whose hue, or rather lack of hue, was due to the fine white fibre.

I will here state the process of making tissue paper from pure white clippings, as detailed by Colonel Thompson, the president of the defendant company, and as witnessed by all of us on the 5th of April. The clippings are first sorted over to remove, as far as practicable, any colored cloth or foreign material. They are then cut up while dry, reducing them to a proper fineness to be washed. They are then immersed in a bleach, being a weak solution of water and chlorine, and agitated. This is called washing them. They are then placed on a drainer to allow this chlorine water or bleach to drain off. This water, after being drained off, is pumped up and used over again. The rags are then subjected to an anti-chlorine treatment to remove, as far as practicable, all chlorine that may remain. They are then placed in an engine called a beater, wherein they are subjected to a severe process, which reduces them to a fine white pulp. This pulp is then placed on a moving wire screen with a mesh of about ninety to the inch. The water is drained out, and with it some of the fibre, and this water, rendered milky in appearance by the fibre, runs down into the canal.

One more remark may be made. Notwithstanding any pains taken to prevent any chlorine from escaping, there was a slight odor of chlorine in the water at the foot of the plane on the 5th of April. But it clearly appears that this chlorine could not injure the Messrs. Oakes, except as it had a slight tendency to render the water a little harder.

One or two other matters may be mentioned.

The water brought down by the canal is naturally softer than

that of Third river, and both are unusually soft. When delivered to the defendant company it contains many foreign matters—decayed vegetables, dead animals and the like—which, before using it for washing the rags, are carefully and thoroughly excluded.

The deposit found in the wheel pit is not composed exclusively of the refuse fibre of the mill, but there is also found in it leaves, decayed vegetables and some ordinary earth, gravel and coal ashes which find their way into it in the shape of wash from one or two roads in the neighborhood and from the banks of the canal.

Let us now inquire as to the rights of the parties under this state of facts. I have already intimated that the canal company has no cause of action. There was, indeed, a hiatus of about two years at or near 1890 when the paper mill in existence at this point was idle, but that will not help the canal company, for it abundantly appears that it had already been in existence under the grant of the canal company to Unangst for more than twenty years before this suspension, and though the grant itself does not specify any particular use to which the water power should be put, yet its use for so many years by a paper mill, operated in its most offensive manner, ripened into a right; moreover, I think that the defendant's argument that it was a practical construction placed by the parties upon the terms of the grant is sound.

The canal company, it appears, did, from time to time, object to the paper mill people casting refuse matters into the canal, but it appears that those refuse matters were lime in its crude condition and pieces of rope and jute canvas and things of that sort which defendant does not claim the right to place there and is not in the habit of placing there.

The proof does not satisfy me that the canal company ever seriously objected to the discharge into the canal of the pulp fibre which, during all this time, had been discharged, and, as the evidence satisfies me, in much greater bulk and quantity than the defendant has ever done, the discharge of which is quite necessary for the making of paper.

Under the doctrine of *McFarlan* v. *Canal Company, 43 N. J. Law (14 Vr.) 605,* a verbal protest was inefficient to arrest the

running of time for the purpose of acquiring a right by virtue of adverse user.

The only possible effect that I can conceive that a verbal protest has upon the relative rights of the parties is to so far modify the practical construction which the parties have put upon the contract as to reduce the quantity and offensive character of the contribution by the paper mill to the canal to such matters as did not affect injuriously the operation of the canal, and that such protest could not, from the very nature of things, extend to the contribution of so much of the paper pulp as the proof shows necessarily must escape from the machines.

But be that as it may, I think, as before stated, the canal company is clearly estopped by its standing by without objection while the defendant was expending thousands of dollars in repairs and additions to the structure of the mill building and many more thousands in the introduction and installing therein of new and expensive machinery.

There remains to deal with the position of the Oakes' company.

I have found, as a matter of fact, that there was no necessity for the canal company to deposit any of this lime water or lime-bearing material into Third river.

I have found also that the defendant was guilty of no wrong to the canal company in any deposit which it has recently made in the canal.

Now, before the Oakes' company can show itself entitled to a remedy by injunction against the defendant, it must show that the defendant is doing it an injury for which it would have a remedy at law.

Now, I find it difficult to see where the defendant is doing the Oakes' company any actionable injury. The contribution of lime held in suspension or in the grasp of paper fibre to the waters of the canal is not the cause of any injury to the Oakes. That injury is due to the independent action of a third party, the canal company, in causing that lime to be emptied into Third river.

Chief-Justice Cooley, treating of this subject in his book on *Torts (p. 68)*, says:

"If an injury has resulted in consequence of a certain *wrongful* act or omission, but only through or by means of some intervening cause, from which last cause the injury followed as a direct and immediate consequence, the law will refer the damage to the last or proximate cause and refuse to trace it to that which was more remote."

And farther on (at *p. 70*) he says:

"If the original act was wrongful, and would naturally, *according to the ordinary course of events*, prove injurious to some other person or persons, and does actually result in injury through the intervention of other causes which are not wrongful, the injury shall be referred to the wrongful cause, passing by those which were innocent. But if the original wrong only becomes injurious in consequence of the intervention of some distinct wrongful act or omission by another, the injury shall be imputed to the last wrong as the proximate cause, and not to that which was more remote."

The learned author, in support of these propositions, cites several adjudged cases, commencing with the famous squib case of *Scott* v. *Shepherd, 2 W. Bla. 892,* and he also mentions *Morrison* v. *Davis, 20 Pa. St. 171; Michaels* v. *New York Central Railroad Co., 30 N. Y. 564.*

Now here, granting for argument's sake only, that the defendant committed a wrong as against the canal company in depositing the lime-bearing material in the canal, that wrong would never have injured the complainant Oakes if the canal company had not in turn deposited it in the Third river. So that, according to the well-settled canon in such cases, the Oakes' company have no cause of action against the defendant.

But there is another point of view worthy of notice. The deposit of lime water in the canal was not inherently injurious to the canal for any purpose; hence it was not what may be termed a natural wrong, whatever it may have been if deposited in Third river.

Now, it is of the essence of the proposition that a party secondarily injured shall not, under any circumstances, be allowed to go back to the original cause of the injury for a remedy when the original act was not a wrongful act in itself, as in the case of the original thrower of the squib.

I find no authority for the position that an act originally inno-

cent of itself can be turned into a wrongful act by the intervention of the act of some third party.

These considerations lead me to the conclusion that none of the complainants are entitled to relief, and I will advise that the bill be dismissed.