The bill of complaint in this cause was filed on November 13th, 1945, on behalf of S. Carl Mantell and Milton Adler, trading as Liberty National Distributors, complainants, against International Plastic Harmonica Corporation (hereinafter referred to as International), defendant, to enjoin the defendant from selling its patented plastic harmonicas to other purchasers, until it had first fulfilled its obligation to supply the complainants with such harmonicas under a contract dated July 3d 1945. Defendant filed an answer and answer in lieu of plea generally admitting the contract, but denying that it had failed to comply with its obligations thereunder, charging that complainants had violated the contract *Page 564 
in various particulars, and that the contract was terminated on or about October 1st, 1945, by the complainants because of said breaches of contract. The cause was brought on for final hearing April 3d 1946, and concluded on April 8th, 1946.
The harmonica manufactured by International is a patented article made up of five major parts. International first began its efforts to produce the harmonica in January of 1945, but did not succeed in actually producing the completed harmonicas until the latter part of July, 1945.
The contract here in dispute, after brief recitals, contains the following covenants and agreements: (a) International appoints complainants as its general distributor for its plastic harmonicas, in New York, Pennsylvania, Delaware, Maryland, Virginia, West Virginia, and the District of Columbia, with the exception of certain types of sales; (b) International agrees to sell, and complainants agree to buy all of the harmonicas produced by International up to certain maxima, i.e., 30,000 per month initially, and 45,000 for each additional injecting moulding machine obtained by International not exceeding four machines; (c) complainants are to cover their assigned territory with proper representatives, traveling agents, correspondents and other sales methods to increase sales, and are to co-operate with International in formulating sales promotion plans and in supplying statistical information. The contract is to run for two years, and is renewable for the succeeding two years unless terminated by either party on three months' notice prior to the end of any term, and is to bind and enure to the benefit of the parties, their heirs, successors and assigns.
Originally, according to Finn H. Magnus, vice-president of International, the defendant planned to have seven distributors throughout the country who would handle all sales, but the complainants were the only distributors appointed, and the plan was abandoned. The reason for its abandonment and apparent reluctance on the part of defendant to comply with the contract will appear later herein.
International was organized in December of 1944, and was still struggling to get into successful production of its product *Page 565 
when the contract was entered into. Magnus and one Christian Christiansen each owned a half of International. Christiansen had paid $35,000 into the business. Christiansen was also the president of the Button Company of America. Magnus knew that complainants had made a loan of $5,000 to that company shortly before the execution of the contract. Prior to the formation of International, Magnus had been working on the harmonica mould at the Button Company, and had the use of the machine shop there for several months, and had completed his experiments there successfully. Magnus says that he did not know whether the money paid into International on behalf of Mr. Christiansen, was paid by the Button Company or Mr. Christiansen personally.
At the time the contract was made the only injecting moulding machine International had was owned by the Button Company. International evidently in order to get into production entered into this contract with complainant which assured it a substantial market. According to Mr. Magnus it took from July 3d 1945, until July 27th of that year to get the first machine in operation to produce the reed plates, and the difficulties encountered in adjusting the mould to produce tuneful harmonicas was explained by him at length. On July 3d 1945, accordingly, when the mould for reed plates was placed in the injecting moulding machine for tuning, there was a possibility, with poor luck, on the testimony of the inventor himself, that effective operation might not be possible for eight or nine months.
After successful production was begun late in July it evidently became apparent to International that their contract with complainants was not as favorable to International as might have been expected. Morris Levy, a witness for the defendant, who had been in the wholesale musical merchandise business for some sixteen years, says that prior to the war all harmonicas used in this country were imported from Germany, Czechoslovakia, or other foreign countries. International having once achieved successful production suddenly discovered that there existed a general market which was far in excess of its productive capacity and beyond its expectations. So on June 29th, 1945, International had three injecting *Page 566 
moulding machines on order, but deliveries were uncertain and the machines were not actually received until the following year. About two months prior to the hearing the defendant had orders for 4,000,000 harmonicas, and had turned down orders for 10,000,000 or 12,000,000. By the end of September, International had produced a total of only 98,696 harmonicas, all of which it was obligated to deliver to complainants, but had not filled an order from complainants for 150,000 requested on August 2d 1945.
Thereafter it appears International attempted to cancel the contract, it having found that the major part of its production was being claimed by the complainants under the terms of the contract. And it is legally inferable that an additional reason for International's attempts to avoid its contract was the greater profit which it could obtain elsewhere from retailers and jobbers. It sold 213 retailers at 60 cents per harmonica, and 43 different jobbers at 45 cents per harmonica during the fall of 1945. The evidence shows to my mind clearly that after the contract was entered into International determined not to perform; witness the undisputed fact that it did not supply the 30,000 harmonicas per month and did not appoint any other distributor, because of which latter fact it now says the contract is unenforceable for lack of price.
The pertinent clause in the contract reads as follows:
"The producer shall deliver to the distributors, and the latter shall take, during every month, beginning with July 1945, all of the harmonicas produced by the producer, but not exceeding 30,000 harmonicas per month, at the lowest prices and with the highest discount which the producer shall give to any other distributor in the United States of America. The initial retail list prices for said harmonicas shall be $1.00 for each black harmonica, $1.15 for each harmonica in solid colors, and $1.25 for each harmonica in mottled colors. All shipments of said harmonicas shall be made either cash on delivery or with sight draft attached to a bill of lading. It is agreed that when the producer obtain another injecting moulding machine and other necessary equipment, that the producer shall deliver to the distributor and the distributors shall take from the producer, an additional 45,000 harmonicas per month, and an additional 45,000 harmonicas per month for each additional machine not exceeding four machines."
International was therefore obligated to deliver to complainants every month its full and entire production of harmonicas *Page 567 
up to the maxima fixed, and of necessity, since International was obligated to deliver "all" of its production up to that point to complainants, its contractual obligation included an agreement not to sell to others before fulfilling its obligation to complainants.
Although 738 harmonicas were produced during July, and the contract specifically called for deliveries during that month, none were delivered to complainants, but deliveries were made on July 25th, 1945, and at other times to other purchasers.
Defendant's own employee and witness, John R. Nichols, who is in charge of the production records of the defendant, produced the original records of International showing production and shipments of harmonicas from the beginning of operations. These were offered in evidence by the defendant and marked ExhibitD-16. These records, and the testimony of Nichols establish International's violation of its obligation to deliver all of its production up to 30,000. Other evidence established the fact that International obtained additional machines within the meaning of the contract, and so became further obligated to sell complainants all of its production each month up to 30,000 plus 45,000 for each additional machine.
The testimony of defendant's own witnesses shows that subsequent to the execution of the contract International acquired the use of an additional machine at least by August, 1945, and so beginning that month International became obligated to deliver an additional 45,000 harmonicas under the contract.
The proofs establish for each month, International's total production; total shipments of International to all purchasers including complainants; total shipments to complainants; and the number of harmonicas shipped to others, to which complainants were entitled, and from such proof it appears that International beginning in July, 1945, consistently violated its contract by selling to others before delivering all of its production up to the maxima fixed in the contract.
The first clause of the contract provides as follows: *Page 568 
"1. The producer [International] hereby appoints the distributors [complainants], and the distributors hereby accepts said appointment, as general distributors of the producer for its plastic harmonicas throughout the State of New York, excepting therefrom the City of New York and all its Boroughs, the states of Pennsylvania, Delaware, Maryland, Virginia, West Virginia and the District of Columbia, excepting, however, in all of said states and District of Columbia, all sales to chain department stores, mail order houses, sales to the export trade, to the American Red Cross, and P.X. stores in the United States Army and Navy Camps. * * *"
Manifestly, the parties intended that complainants were to be the general distributors in the contract territory, and that International would not make any sales in that territory with the exceptions of the sales enumerated. That the defendant so understood appears from the testimony of Mr. Mantell that International during the early days of the contract had forwarded to complainants some thirty letters from retailers in the contract territory. Indeed, in paragraph 9 of the answer filed by International it is stated that: "Prior to October 1st, 1945, defendant mailed to complainants all prospective purchase inquiries received by defendant from persons or corporations in complainants' territory to whom defendant was not entitled under said contract to make sales."
However, notwithstanding the contract restriction, the evidence shows the following sales by International in violation of complainants' contract: To National Sales in Baltimore, Maryland, directly during the period from August 31st, 1945, to December 15th, 1945, a total of 12,984 harmonicas; indirectly, through one Sol Sokler after the court had granted its temporary restraining order, during the period from January 30th to March 30th, a total of 44,576. In addition to these shipments, complainants' witness Lester I. Swindell, a certified public accountant associated with Peat, Marwick, Mitchell and Company, testified that in the course of his examination of International's books the following shipments by International to purchasers in complainants' contract area were noted during the period from December 17th, 1945, to March 7th, 1946: December 19th, 1945, 144 black harmonicas shipped to Jacob Brothers in Philadelphia, and billed to Bach Feinberg Company in New York City at 45 cents each; *Page 569 
February 22d 1946, 6,000 black harmonicas to Kaufman's Warehouse in Pittsburgh, Pennsylvania, at 60 cents each; February 17th, 1946, 36 red harmonicas to the Hub in Baltimore, Maryland, at 69 cents each; February 26th, 1946, 250 black harmonicas and 250 ivory to Joseph Horn in Pittsburgh, Pennsylvania, at 60 cents each and 69 cents each, respectively.
The difficult position complainants were placed in by International's failure to fulfill its obligations was clearly established. Not being able to fill orders, they were compelled to return and refund moneys they had received with orders.
International's only reason for stopping shipments to complainants on August 23d 1945, was the result of a conference had with one Morris Levy who produced one Mr. Sokler of Carteret to complete the "arrangement" for sales in Baltimore which complainants brought to the attention of the court in contempt proceedings. Levy came up to see Mr. Magnus on July 15th, and while there on July 15th placed an order for harmonicas. When asked for how many, he replied "a thousand pieces or something like that." When asked if Magnus told him on July 15th of the delivery date, he replied no delivery date was set. When he was asked whether he made "any other arrangements besides this order for two hundred," he replied "No, no other arrangements." When asked "did you talk to Mr. Magnus about selling you more than the two hundred," he replied, "Yes, sir * * * we placed a very substantial order." When asked for how many he replied, "Oh, possibly twenty, thirty thousand * * *." The cross-examination continued: "Q. How many did you order on July 15th? You told us two hundred. Now you are up to twenty or twenty-five thousand? Mr. Toolan: I don't want to interrupt. I don't want to stop the examination, but this is an erroneous statement. The court: He can straighten it out. The witness: Here I have a list of the shipments we had made the ____ Q. I want to know the dates of the orders. A. The 15th of July. Q. July. And how many did you order on the 15th of July? A. Possibly twenty or thirty thousand pieces * * *." Thereafter Levy after testifying that he had sold the last of his harmonicas before Christmas, was *Page 570 
confronted with a billhead of his own concern for deliveries of harmonicas in March, whereupon he was compelled to testify as to the Carteret "arrangement." Levy had written to International as far back as April 3d 1945, asking for jobbers' prices and delivery dates. He wrote again on April 30th and again on July 25th.
This is the foundation upon which Mr. Magnus bases his reason for stopping shipments to complainants on August 23d 1945. Having received a complaint from an obviously highly prejudiced source, without communicating with complainants he stopped all shipments, and at the same time accepted an order for shipment of harmonicas to Levy, which order was filled on August 31st, not at the distributor's price of $.40 1/2 for blacks, and $.40675 for colored but for $.45 for blacks, and $.52 for colored.
The proofs before me and reasonable inferences drawn therefrom, establish that International's attack on complainants' performance is not made in good faith, but rather is it an attempt to avoid the contract. The complainants performed all of their obligations under the contract under the circumstances.
Unless this court grants equitable relief, complainants will be deprived of valuable property rights, and their remedy at law will be inadequate. The harmonicas which are the subject-matter of this suit are of unusual design and are patented. They are, therefore, legally and factually unique, since they cannot properly be obtained from any other source. A judgment for money damages, however ascertained, will not enable complainants to purchase these harmonicas elsewhere and continue in business.
The subject-matter of this contract and the nature of its terms are such as to render it impossible to arrive at a legal measure of damages with any degree of certainty, and accordingly any remedy at law is legally inadequate. 4 Pom. Eq. Jur. (5th ed.1941) 1039 § 1403.
International has covenanted to sell complainants all of their production up to certain maxima, and has made complainants the general distributor in the contract area. By necessary implication these affirmative covenants carry with it *Page 571 
an agreement on the part of International not to do anything inconsistent with such promises.
The apposite rule of implication is well stated in 5 Willistonon Contracts (Rev. ed. 1937) 4045 § 1448:
"Moreover, a promise which is affirmative both in form and substance may carry with it not only an agreement to do what it specifically agreed, but by necessary implication an agreement not to do anything inconsistent therewith. Thus, where a person promises to sell his entire production to the promisee, or to sell only the promisee's products, as the case may be, it is necessarily implied that he will sell to or for no one else."
Since International has contracted to sell all of its production to complainants up to certain maxima, and has made complainants its general distributor in the contract area, an implied covenant arises by necessity that International will not sell to others before furnishing the maxima to complainants, and will not compete in the contract area by selling to others.
The authorities in this state clearly establish the propriety of the enforcement of negative promises by injunction. In Myers
v. Steel Machine Co. (Court of Chancery, 1904), 67 N.J. Eq. 300; 57 Atl. Rep. 1080; affirmed, per curiam (Court of Errorsand Appeals, 1905), 68 N.J. Eq. 795; 64 Atl. Rep. 746, it appeared that the defendant had contracted to sell to the complainant, all of the patented printing machines that he produced, and apparently by implication, had agreed not to sell to others. Complainant sought a decree of specific performance of the affirmative covenants, and an injunction restraining defendant from selling to others. The court held (at p. 314):
"* * * The circumstances of the case justify the allowance of an injunction restraining the defendant company from selling or attempting to sell Johnston automatic printing presses, with the Johnston patent feed, to any other person or persons than the complainants, contrary to the terms of the defendant's agreement.
"The complainants insist that they are entitled to a decree which shall compel the defendant company specifically to perform its agreement according to its terms. *Page 572 
"There is a class of cases in which the agreement sought to be enforced is sufficiently established and the obligation of the defendant is conclusively shown but in which courts of equity refuse to make a mandatory decree for specific performance. These decisions have been given on contracts which require the defendant to do some personal act, because of his artistic capacity or skill in that matter — as an engagement to sing at a theatre and not elsewhere (Lumley v. Wagner, 1 DeG. M. G.604), or to build a house. Errington v. Aynesly, 2 Bro. Ch.Cas. 343. In such cases equity will enforce a negative covenant and restrain the defendant from giving another than the complainant (whom he contracted exclusively to serve) the benefit of his skill, but it will not make a mandatory decree to compel the defendant to exercise his art in the actual performance of the contract. Lumley v. Wagner, ubi supra; Montague v.Flockton, 16 Eng. Eq. 189.
"In the case at bar the defendant company has agreed to manufacture and sell to the complainants (and to no one else so long as the complainants take all that the defendant shall produce) certain machines, which shall be `in good working order when put up for running.' The evidence shows that a considerable degree of mechanical skill is required to produce the machine in question in such perfection of performance that when put up for running it shall be in good working order. This court cannot compel the continued exercise of personal skill in the production and sale to complainants of a succession of perfectly working machines. It will not, for this reason, make a decree requiring such acts to be done. It may and will, however, restrain the defendant company, which agreed to do those acts exclusively for the complainants, from doing them for or with any other person. * * *"
In Feigenspan v. Nizolek (Court of Chancery, 1906),71 N.J. Eq. 382; 65 Atl. Rep. 703; affirmed, per curiam (Court ofErrors and Appeals, 1907), 72 N.J. Eq. 949; 68 Atl. Rep. 1116,
the defendant had agreed for a period of five years to purchase ales, lager, beer and porter only from complainant, and agreed not to sell the product of others. The contract did not specify any price and it contained no provision that *Page 573 
complainant would furnish the beer and no provision as to its quality. The court, in granting the injunction, held (at p.391):
"* * * By its bill the complainant asks that the defendant be restrained from purchasing his beer from any other brewer, and tenders itself ready and willing to furnish beer on the usual terms. There is no undertaking in words in the contract on complainant's part to furnish beer at any time, but I find no difficulty in protecting the defendant by a decree which shall provide that the restraint shall continue only so long as the complainant shall continue to furnish beer to defendant at reasonable rates and of good quality, and leaving to the defendant the liberty to apply to be relieved of the restraint if complainant shall fail in that behalf. * * *."
A similar holding was made in Mausert v. Feigenspan (Courtof Errors and Appeals, 1905), 68 N.J. Eq. 671;63 Atl. Rep. 610, and Peoples Brewing Co. v. Levin (Court of Errors andAppeals, 1911), 78 N.J. Eq. 583; 81 Atl. Rep. 1114, adoptingper curiam, opinion of Vice-Chancellor Walker reported in81 Atl. Rep. 1114. It will be noted in this last case that defendant's principal defense was that the beer was of poor and unmarketable quality and had deteriorated to such an extent as to be practically unfit for use.
The problem was presented in Atlantic Refining Co. v. Kelly
(Court of Errors and Appeals, 1930), 107 N.J. Eq. 27;151 Atl. Rep. 600, where an injunction was sought restraining defendant from selling gasoline, motor fuels, motor oils and grease manufactured by persons other than complainant. The contract was for a term of five years and contained a negative clause. The court held that an injunction restraining defendant from selling motor fuel, oil and grease not manufactured and sold by complainant was proper. It will be noted that defendant had contended that the gasoline furnished by complainant was watered and dirty. It is therefore implicit in the court's decision, that during the balance of the contract period complainant would be obliged to perform its contractual duties by supplying oil products at proper times, and of proper quality. *Page 574 
An injunction was granted in a very similar case in PhillipsOil Co. v. Galka (Court of Chancery, 1941), 130 N.J. Eq. 386; 22 Atl. Rep. 2d 533.
In Manhattan Manufacturing, c., Co. v. New Jersey StockYard, c., Co. (Court of Chancery, 1872), 23 N.J. Eq. 161,
the defendant had entered into an agreement with complainants, under which complainant was granted the exclusive right of saving and taking all of the blood from animals slaughtered in defendant's abbatoir, and of saving and taking the animal matter and ammonia from the rendering tanks. Complainant, relying upon the contract, sought an injunction restraining defendant from selling the blood and animal matter to others.
In granting the injunction the court noted that defendant had originally gotten into serious difficulty in having the blood and matter removed, and had been enjoined, on the ground of nuisance, from operating except on the condition of having the blood and offal perfectly cared for. The court stated (at p. 163): "* * * These difficulties became a serious embarrassment in the enterprise. The complainant undertook to manage this, and to remove and manufacture the blood and other abandoned refuse left on the premises by the butchers, so as to prevent any public or private nuisance that might else arise from them. * * *" The contract in that case provided specifically that complainants "* * * hereby bind themselves to save all that is possible of the blood from the animals slaughtered, and the animal matter and ammonia from the tanks, to prevent any effluvia or stenches from escaping, and to prevent any and all nuisance from being created in any manner whatsoever, either in saving the blood, animal matter, or ammonia, or in converting the same into articles of commerce."
The New Jersey authorities referred to above are in accord with many decisions in other jurisdictions. A leading case on the subject is Singer Sewing Machine Co. v. Union Button-Hole andEmbroidery Co. (C.C.D., Mass., 1873), 22 Fed. Cas. No.12,904; Holmes 253. In that case complainants had contracted to buy the full capacity of defendant's factory making patented machines for manufacturing button holes, and complainants were to be the sole and exclusive *Page 575 
agent for the sale of the machines in certain territory, and was to supply the market and use certain means and facilities at its command for this purpose. It was further provided that the agency would continue for the duration of the patents, "provided that the Singer Sewing Machine Company shall fairly and reasonably conduct such agency, and shall continue to supply the market with machines as aforesaid * * *." The court granted the injunction, holding (at p. 222): "I think the fair result of the latter cases may be thus expressed: If the case is one in which the negative remedy of injunction will do substantial justice between the parties, by obliging the defendant either to carry out his contract or lose all benefit of the breach, and the remedy at law is inadequate, and there is no reason of policy against it, the court will interfere to restrain conduct which is contrary to the contract, although it may be unable to enforce a specific performance of it. It seems to me that this case comes easily within this rule. * * *"
The foregoing authorities make it clear that an injunction is proper in the present cause. Its effect will compel defendant to make deliveries to complainants in accordance with the contract, and to cease competing in contract area. Such relief will not create any injustice as against defendant.
This contract is essentially one of purchase and sale, and does not involve personal services of any party. It will be noted that the contract specifically provides that "This contract shall bind and enure to the benefit of the parties hereto and their respective heirs, executors, successors and assigns." It is a purchase and sale agreement, under which the purchaser, having committed himself to make large purchases, is given some protection on resale by means of an exclusive territory agreement.
Neither does the contract fail for uncertainty in price. The contract provides as follows: "The producer shall deliver * * * at the lowest prices and with the highest discount which the producer shall give to any other distributor in the United States * * *."
The defendant has the right to fix the price, but he cannot defeat complainants' right of purchase, by arbitrarily refusing *Page 576 
to act. The standard and maxima within which he may act are definitely fixed in the contract. Under the contract the price to complainants can be no greater than the price to any other distributor. The price to complainants of necessity must be lower than any offered to subordinate purchaser Such as jobbers, dropship jobbers, retailers and consumers.
Such price scales were recognized and actually used by defendant ante litem motam. This well established business practice is also recognized in the OPA prices which were fixed for this product on the application of defendant. The prices were fixed as follows:
 Maximum price Max. Price to
 Article to Distributor Jobber
Black and white harmonica
4 3/16" x 7/8" x 1 3/16" $.40 1/2 each $.45 each
Maximum price
 to Drop-ship Maximum Price Maximum Price to
 Jobber to Retailer Consumer
 $.47 $7.20 dozen $1.00

Significantly the prices fixed by International independently on colored harmonicas were comparable.
In cross-examining Mr. Magnus with reference to an offer made to complainants during the course of the litigation which set prices at $.80 and $.89, he admitted that at the same time International was offering the harmonicas to jobbers at $.45. Mr. Magnus admitted that, in the course of his business experience, he had never before heard of a case where a distributor was charged almost double the price to the jobber.
It will be noted that the provision herein contained is infinitely more certain than any found in the contract considered in Feigenspan v. Nizolek, supra. The court concluded in that case, however, that a "reasonable price was intended" and granted an injunction upon that basis.
Injunction will issue restraining defendants from directly or indirectly selling the patented harmonicas to anyone but complainants until it has supplied them from the harmonicas it produces up to July 3d 1947, with at least 30,000 harmonicas *Page 577 
per month from the production of one of its injecting moulding machines, and 45,000 harmonicas per month from each additional injecting moulding machine not exceeding four such additional machines; to desist and refrain from directly or indirectly engaging in competition with complainants in the State of New York, excepting therefrom the City of New York and all its boroughs, the States of Pennsylvania, Delaware, Maryland, Virginia, West Virginia and the District of Columbia, excepting however, in all of said states and District of Columbia, all sales to chain department stores, mail order houses, sales to the export trade, to the American Red Cross, and post exchange stores in the United States Army and Navy camps until July 3d 1947, or until further order of this court; and to desist and refrain from selling or disposing or attempting to sell or dispose of the patent and patent rights under which these harmonicas are manufactured, until July 3d 1947, or until further order of the court.
Complainants also pray for discovery, accounting and damages. Assessment of unliquidated damages while deemed the peculiar function of a jury, nevertheless the Court of Chancery has power to assess damages where the cause is otherwise within its control and the interests of justice will be served by that course.Middlesex Concrete, c., Co. v. Northern States Imp. Co.,129 N.J. Eq. 314, 317; 19 Atl. Rep. 2d 48. And in 1 Pom. Eq.Jur. (5th ed.), § 237b, the author says:
"Specific Performance. — As an outgrowth of the doctrine that a court of equity, when jurisdiction is once assumed on equitable grounds, will adjudicate all matters properly presented by and actually involved in the case at hand, it is ordinarily held that where the case is a proper one for specific performance the chancellor may, as ancillary to the relief given, decree compensation or damages. Hence, having jurisdiction for the purpose of specifically enforcing performance of a contract, the chancellor has full jurisdiction, in addition to decreeing specific performance, to award such legal damages as have resulted from delay in performance of the contract."
In the instant case the defendants have waived their right to trial by jury under R.S. 2:29-9 since that right was not demanded in the pleadings. It is essential that a demand for *Page 578 
a jury trial be made in the pleadings. Commonwealth Quarry Co.
v. Gougherty, 105 N.J. Eq. 642; 149 Atl. Rep. 356.
During the course of the final hearing it was developed that defendants violated the intermediate injunction issued on December 7th, 1945. Upon petition an order to show cause issued why they should not be held in contempt. Testimony was taken and arguments of counsel heard thereon, and the defendants adjudged guilty of contempt for violation of that order.
There are numerous cases, both federal and state, holding that a party injured by contempt arising from a breach of the court's order may be awarded damages for such injuries by way of a fine assessed in such injured party's favor, and such damages found by the court itself or by a master appointed for that purpose.Wells, Fargo Co. v. Oregon Railway and Navigation Co.,19 Fed. Rep. 20; Re North Bloomfield Gravel Mining Co.,27 Fed. Rep. 795; Leman v. Krentler Arnold Hinge Last Co., 284 U.S. 448;76 L.Ed. 389.
In Ashby v. Ashby, 62 N.J. Eq. 618; 50 Atl. Rep. 473, the defendant was found guilty of contempt of an order restraining him from removing fixtures from a mill and from committing waste. The Chancellor decided that the complainant's remedy was in equity for damages and that such damages would be measured by a reference to a master. In Thompson v. Pennsylvania RailroadCo., 48 N.J. Eq. 102, the defendant's superintendent was found guilty of a civil contempt. Vice-Chancellor Pitney pointed out that when a complainant in equity suffers damages by the breach of an injunction, such damages were capable of liquidation in Chancery for such civil contempt has as its end relief interpartes.
The matter will be referred to a special master to inquire and ascertain the extent of the damages sustained by complainants and the extent of the profits made by the defendant by reason of the violation of the contract and the breach of the injunction. *Page 579